BELL ATLANTIC–PENNSYLVANIA,
INC., Plaintiff,

v.

The PENNSYLVANIA PUBLIC
UTILITY COMMISSION,
et al., Defendants.

No. CIV. A. 99–5391.

United States District Court,
E.D. Pennsylvania.

Aug. 3, 2000.

Henry F. Siedzikowski, John M. Elliott, Elliott, Rihner, Siedzikowsky and Egan, P.C., Blue Bell, PA, Samuel L. Feder, Geoffrey M. Klineberg, Mark L. Evans, Kellogg Huber Hansen Todd & Evans, Washington, DC, for plaintiff.

Maryanne R. Martin, Harrisburg, PA, Elisabeth H. Ross, Harvey A. Levin, Birch, Horton, Bittner and Cherot, Washington, DC, for Pennsylvania Public Utility Com'n, John M. Quain, Robert K. Bloom, Nora Mead Brownell, Aaron Wilson, Jr., defendants.

Albert G. Bisler, Eckert Seamans Cherin & Mellott, Philadelphia, PA, for Vincent J. Fumo, Roger A. Madigan, Mary Jo White, defendants.

Virginia H. Miller, Virginia Hinrichs McMichael, Dilworth Paxson, LLP, Philadelphia, PA, Thomas, Dilworth, Paxson, Kalish and Kauffman, Philadelphia, PA, Jeffrey A. Rackow, Washington, DC, Michael B. DeSanctis, Jenner & Block, Washington, DC, Matthew B. Pachman, Wash-

ington, DC, for MCI Worldcom Network Services, Inc., MCIMetro Access Transmission Services, LLC, intervenor–defendants.

Joseph C. Crawford, Wold, Block, Schorr and Solis–Cohen, Philadelphia, PA, for AT&T Communications of Pennsylvania, Inc., TCG Pittsburgh, TCG Delaware Valley, Inc., intervenor–defendants.

Michael D. Klein, LeBoeuf, lamb, Greene & MacRae, L.L.P., Harrisburg, PA, Jan L. Fox, LeBoeuf, Lamb, Greene & MacRae, Pittsburgh, PA, for Sprint Communications Co., L.P., United Telephone Co. of Pennsylvania, intervenor–defendants.

David Zaring, U.S. Atty's Office, Washington, DC, for U.S., intervenor–plaintiff.

## MEMORANDUM AND ORDER

KATZ, Senior District Judge.

Now before the court is the motion to dismiss submitted by defendants the Pennsylvania Public Utility Commission (PUC) and Commissioners John M. Quain, Robert K. Bloom, Nora Mead Brownell, and Aaron Wilson, Jr., as well as the motion for judgment on the pleadings submitted by intervening state senators Vincent J. Fumo, Roger A. Madigan, and Mary Jo White. The motions seek dismissal of this action on the grounds of Eleventh Amendment immunity or, in the alternative, abstention in light of ongoing state court proceedings. In addition, the motions seek to dismiss as untimely the crossclaims of intervenors MCI WorldCom Network Services, Inc. and MCImetro Access Transmission Services, LLC (collectively, Worldcom), and the crossclaims of intervenors AT & T Communications of Pennsyl-

vania, Inc., TCG Pittsburgh, and TCG Delaware Valley, Inc. (collectively, AT & T). Finally, the motions seek dismissal of counts four and five of plaintiff Bell Atlantic–Pennsylvania's (Bell) complaint, as well as part of Worldcom & AT & T's claims, for failure to state a claim upon which relief can be granted.[1]

Additional intervenors in this action are Sprint Communications Company and the United Telephone Company of Pennsylvania (collectively, Sprint), and the United States. Sprint did not take a position on either motion. The United States intervened for the purpose of defending the constitutionality of the Telecommunications Act of 1996(TCA).

## I. Background

### A. Telecommunications Act of 1996

This case involves the provisions of TCA that seek to foster competition in local telecommunications services.[2] *See* 47 U.S.C. §§ 251–52.

> Until the 1990s, local phone service was thought to be a natural monopoly. States typically granted an exclusive franchise in each local service area to a local exchange carrier (LEC), which owned, among other things, the local loops (wires connecting telephones to switches), the switches (equipment directing calls to their destinations), and the transport trunks (wires carrying calls between switches) that constitute a local exchange network.

*AT & T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 371, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999). Bell, the plaintiff, is an incumbent LEC.

---

1. The senators' motion fully incorporates the PUC and the Commissioners' motion to dismiss and makes no additional arguments. Accordingly, the court will not address the senators' motion separately; all references in this memorandum to the motion to dismiss, and the arguments therein, also encompass the senators' motion.

2. "It would be gross understatement to say that the 1996 Act is not a model of clarity. It is in many important respects a model of ambiguity or indeed even self-contradiction. That is most unfortunate for a piece of legislation that profoundly affects a crucial segment of the economy worth tens of billions of dollars." *AT & T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 397, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999).

The TCA attacks the regulatory protections that sheltered local telephone monopolies by "preempt[ing] all state and local legal barriers to entry into the local telephone market," including the state-sanctioned exclusive franchises formerly enjoyed by incumbent LECs. *Bell Atlantic–Delaware, Inc. v. McMahon*, 80 F.Supp.2d 218, 222 (D.Del.2000) (citing 47 U.S.C. § 253(a)). Through sections 251 and 252, TCA also attempts to alleviate economic barriers, recognizing that an incumbent LEC's network provides it with a competitive advantage because the cost of constructing a new, wholly redundant network is generally prohibitive. *See, e.g., id.; MCI Telecomm. Corp. v. Illinois Bell Tel. Co.*, 222 F.3d 323, 328 (7th Cir.2000). To that end, the TCA subjects incumbent LECs to "a host of duties intended to facilitate market entry" including "the LEC's obligation under 47 U.S.C. § 251(c) ... to share its network with competitors." *Iowa Utils. Bd.*, 525 U.S. at 371, 119 S.Ct. 721. Section 251(c) provides three ways a competitor can gain access to an incumbent LEC's network: "It can purchase local telephone services at wholesale rates for resale to end users; it can lease elements of the incumbent's network 'on an unbundled basis'[3]; and it can interconnect its own facilities with the incumbent's network."[4] *Id.* The TCA also requires an incumbent LEC to allow a competitor to collocate "equipment necessary for interconnection or access to unbundled network elements." 47 U.S.C. § 251(c)(6).

The Act requires that an incumbent LEC and any competitor negotiate an agreement in good faith. *See* 47 U.S.C. § 251(c)(1). During these negotiations, any party may request the state commission that regulates telephone services to mediate. *See id.* § 252(a)(2). In the event that the negotiations fail, the TCA provides that either party may petition the state commission to arbitrate any open issues. *See id.* § 252(b). An agreement encompassing the access methods detailed in section 251(c), whether arrived at privately or through compulsory arbitration, must be approved by the state commission. *See id.* § 252(e)(1). The TCA limits the grounds under which a commission may reject an agreement under federal law and regulations, *see id.* § 252(e)(2), while preserving a state's authority to impose additional conditions that do not conflict with federal law. *See id.* § 252(e)(3) (stating that, notwithstanding section 252(e)(2) but subject to 47 U.S.C. § 253, "nothing in this section shall prohibit a State commission from establishing or enforcing other requirements of State law in its review of an agreement[.]"). If a state commission fails to act under section 252, the Federal Communications Commission (FCC) will preempt the state commission's jurisdiction and responsibilities over the access agreements.[5] *See id.* § 252(e)(5); *see generally Illinois Bell*, 222 F.3d at 328–29 (detailing section 252's procedural scheme); *MCI Telecomm. Corp. v. Public Serv. Comm'n*, 216 F.3d 929, 933 (10th Cir.2000) (same).

**3.** Access to unbundled network elements allows competitors who do not have a fully redundant network to "fill in the gaps of their own network by purchasing pieces" of an incumbent LEC's network. *McMahon*, 80 F.Supp.2d at 223. "These pieces are known as 'unbundled network elements' or 'UNEs.'" *Id.*

**4.** "Some competitors, such as cable companies, ... have existing networks of their own that enable their subscribers to communicate with each other.... [However,] a fair agreement with the [incumbent LEC] will be required to enable the new entrant's customers to place calls to, and receive calls from, the [incumbent LEC's] subscribers." *McMahon*, 80 F.Supp.2d at 223.

**5.** A state commission fails to act when it does not respond within a reasonable time to a request for mediation or arbitration or does not complete an arbitration within a specific time period. *See Illinois Bell*, 222 F.3d at 329 (citing 47 C.F.R. § 51.801(b)). "A state commission will not be deemed to have failed to act, however, if it merely fails to approve or reject an agreement within the established time limits." *Id.* (citing 47 C.F.R. § 51.801(c)).

"In any case in which a State commission makes a determination under ... [section 252], any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements" of sections 251 and 252. 47 U.S.C. § 252(e)(6). Moreover, "[n]o State court shall have jurisdiction to review the action of a State commission in approving or rejecting an agreement" under section 252. *Id.* § 252(e)(4).

### B. The Parties' Challenges to the PUC's Global Order

At the heart of this action is an Opinion and Order entered by the PUC on September 30, 1999 (Global Order). In the Global Order, the PUC addressed the "several interrelated dockets implementing state and federal telecommunications policy in the Commonwealth of Pennsylvania." Global Order at 2 (Compl.Ex.1). The PUC undertook the proceedings that culminated in its Global Order upon concluding that its previous system of separately adjudicating individual telecommunications cases did not lead to "satisfactory and prompt resolution" of the morass of issues raised by federal and state law mandates to provide consumers with competitive local telecommunications services. *Id.*

The PUC first attempted to settle the outstanding issues by negotiation, but this method failed. Two competing petitions were then filed before the Commission— one supported by Bell and others, and the second supported by Worldcom; A & T; Senators Fumo, Madigan, and White; and others. The Global Order resolved the issues raised by the two petitions, as well as the pending interrelated dockets that were consolidated for that purpose.

The action before this court alleges that several aspects of the Global Order violate federal law.[6] Bell, Worldcom, and AT & T all contend that rates for unbundled network elements (UNE) set by the Global Order violate the TCA.[7] An order entered by the PUC on August 7, 1997, first set permanent rates for access to Bell's UNEs after a proceeding before the Commission commonly referred to as MFS–Phase III. "[N]umerous, subsequent agreements" incorporated the rates set by the MFS–Phase III Order. Compl. ¶ 22. The Global Order rates replace the MFS–Phase III rates.

Bell also challenges the PUC's authority under federal law to require it to provide unbundled access to switching throughout Pennsylvania and to provide unbundled access to digital subscriber line access multiplexers (DSLAMs).[8] Bell contends it should not be required, under federal law and regulations, to make these network elements available because failure to provide them would not impair a competitor's ability to provide services and because they are not necessary for a competitor to provide service. In addition, it contends that the PUC failed to engage in the analysis required by the TCA in determining that Bell make these elements available on an unbundled basis.

Finally, Bell challenges the discount wholesale rates for retail services set by the Global Order. While the wholesale discount rates set by a previous PUC decision are generally unaffected, the Global Order increases for one year the discount rate Bell may charge its competitors for retail services in less populated areas of the Commonwealth as part of a "Rural/Residential Promotion."

**6.** As noted *infra,* these and other aspects of the Global Order are being challenged in state court proceedings as well.

**7.** In addition, AT & T alleges that the PUC's decision to allow Bell to maintain rates in excess of just and reasonable levels for an

additional period of up to one year violates the TCA and federal regulations.

**8.** DSLAMs are "devices that allow users to transmit data and voice communications simultaneously over high-speed digital lines." Bell Mem. in Opp. at 4–5.

Bell brings its claims pursuant to the TCA, 42 U.S.C. § 1983, and 22 U.S.C. § 2201(a), and seeks declaratory and injunctive relief. AT & T and Worldcom bring their claims pursuant to the TCA and seek declaratory and equitable relief.

### C. Other Proceedings

■ Two other proceedings are relevant to this action. The first is a challenge by Bell to the Global Order in state court. That action includes the federal claims asserted here, as well as state law claims regarding other aspects of the Global Order. Numerous parties, including most of the intervenors in this action, are participating in the state action. Bell contends that it raised the federal claims in the state court solely as a protective measure; in its petition for review before the Commonwealth Court, it reserved the federal claims pursuant to *England v. Louisiana State Board of Medical Examiners*, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964).[9]

The second proceeding was a case in the Middle District of Pennsylvania, *MCI Telecommunications Corp. v. Bell Atlantic-Pennsylvania, Inc.*, No. 1:CV–97–1857. Worldcom brought that action, pursuant to the TCA, to challenge an interconnection agreement with Bell that had been approved by the PUC. That agreement incorporated the UNE rates set by the MFS–Phase III Order. *See id.*, Report and Recommendation, at 3 (M.D.Pa. Aug. 10, 1998) (Worldcom's Brief in Opp. to Mot. to Dismiss, Ex. 8).[10] The Middle District court held that the PUC was not immune

under the Eleventh Amendment, *see id.*, Order (M.D.Pa. Nov. 5, 1998) (Worldcom's Brief in Opp. to Mot. to Dismiss, Ex. 9), and, on June 30, 2000, it denied both the PUC's motion to certify its decision on immunity for interlocutory appeal,[11] *see id.*, Mem. and Order (M.D.Pa. June 30, 2000) (PUC's Reply Brief, Ex. 1), and decided the action on the merits, *see id.*, J. and Mem. (M.D.Pa. June 30, 2000) (Worldcom's Resp. in Opp. to the Mot. for J. on the Pleadings, Ex. 1). On July 20, 2000, Bell filed a motion for relief from judgment pursuant to Federal Rule of Civil Procedure 60 in light of a recently issued decision by the Eighth Circuit that vacated portions of the FCC regulations upon which the Middle District Court relied. *See* Bell's Mot. for Relief from J. Pursuant to Fed.R.Civ.P. 60 and Request for Expedited Consideration (attached to this court's Order of July 24, 2000); *see also Iowa Utils. Bd. v. FCC*, 219 F.3d 744 (8th Cir.2000). That motion was denied. *See MCI Telecomm.*, Civ. No. 1:CV–97–1857, Mem. and Order (M.D.Pa. July 25, 2000).

### II. Discussion

### A. Standard of Review

■ Because this action is brought pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, the court's standard of review varies. In evaluating a motion to dismiss for failure to state a claim under Rule 12(b)(6), a court generally considers only the allegations in the pleadings. *See, e.g., Halstead v. Mo-*

---

**9.** An *England* reservation allows a party who has been forced to litigate in state court to reserve its federal claims for federal adjudication. The party informs the state court of the nature of the federal claims, that it does not wish to litigate those federal claims in the state court, and that the party intends, should the state court rule against it on the questions of state law, to return to federal court for disposition of the federal claims. *See Bradley v. Pittsburgh Bd. of Educ.*, 913 F.2d 1064, 1071 (3d Cir.1990).

**10.** The magistrate judge's report and recommendation was adopted by the district court. *See MCI Telecomm. Corp. v. Bell*, No. 1:CV–97–1857 (M.D.Pa. Nov. 5, 1998) (Worldcom's Brief in Opp. to Mot. to Dismiss, Ex. 9).

**11.** Notwithstanding the PUC's motion, a district court's denial of a claim of Eleventh Amendment immunity is immediately appealable. *See, e.g., Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy*, 506 U.S. 139, 147, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993); *We, Inc. v. City of Philadelphia*, 174 F.3d 322, 325 (3d Cir.1999).

*torcycle Safety Found., Inc.*, 71 F.Supp.2d 464, 467 (E.D.Pa.1999). However, matters of public record, orders, and exhibits attached to the complaint may also be considered. *See id.* The court must accept as true all factual allegations in the complaint, as well as all reasonable inferences that can be drawn therefrom, and construe them in the light most favorable to the plaintiff. *See Markowitz v. Northeast Land Co.*, 906 F.2d 100, 103 (3d Cir.1990). Dismissal under Rule 12(b)(6) is only appropriate where there is no set of facts that could be proved upon which relief could be granted. *See id.*

On the other hand, the standard to be applied to a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) depends on whether the defendant makes a facial or factual challenge. *See Halstead*, 71 F.Supp.2d at 468. Under either approach, it is generally the plaintiff's burden to prove that jurisdiction exists. *See id.* However, in a facial challenge, where the allegations of jurisdiction in the complaint are disputed, "the factual allegations of the complaint are presumed to be true and the complaint is reviewed to ensure that each element necessary for jurisdiction is present." *Id.* Where the challenge is factual, "any evidence may be reviewed and any factual disputes resolved regarding the allegations giving rise to jurisdiction[.]" *Id.*

The Eleventh Amendment is a jurisdictional bar and may be raised by a motion to dismiss. *See Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690, 693 n. 2 (3d Cir.1996). The doctrine of abstention allows a court to decline to exercise its jurisdiction, *see, e.g., Kentucky W. Va. Gas Co. v. Pennsylvania PUC*, 791 F.2d 1111, 1114 (3d Cir.1986), and may also be raised by a motion to dismiss. The court concludes that invocation of the Eleventh Amendment constitutes a facial challenge to its jurisdiction, requiring the court to accept as true the factual allegations in the

complaint, while invocation of abstention doctrines constitutes a factual challenge, allowing the court to conduct a wider inquiry.

### B. Eleventh Amendment

The PUC [12] first seeks dismissal of this action on Eleventh Amendment grounds. That amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. Although by its literal terms the Eleventh Amendment only prohibits suits against a state by citizens of another state or of a foreign state, the Supreme Court has held that the amendment applies to suits brought against a state by its own citizens, *see, e.g., Edelman v. Jordan*, 415 U.S. 651, 662–63, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), and to suits involving state agencies. *See, e.g., Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy*, 506 U.S. 139, 144, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993).

State sovereign immunity under the Eleventh Amendment is not, however, absolute, as the Tenth Circuit explained:

First, a state may not assert an Eleventh Amendment defense where Congress has properly abrogated its immunity. Second, a state may waive its sovereign immunity by consenting to suit in federal court. Third, a private party may sue a state officer for prospective injunctive or declaratory relief from an ongoing violation of the Constitution or federal laws.

*Public Serv. Comm'n*, 216 F.3d at 935 (citing *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 55, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996); *College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 119 S.Ct. 2219,

---

**12.** Unless otherwise indicated, any further references to the PUC encompass both the

Commission and the individual Commissioners.

144 L.Ed.2d 605 (1999); *Ex parte Young,* 209 U.S. 123, 159–60, 28 S.Ct. 441, 52 L.Ed. 714 (1908); *Alden v. Maine,* 527 U.S. 706, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999)). In *Seminole Tribe,* the Supreme Court held that Congress may only abrogate a state's sovereign immunity when it acts pursuant to its powers under the Fourteenth Amendment. *See* 517 U.S. at 59, 72–73, 116 S.Ct. 1114; *see also College Sav. Bank,* 527 U.S. at 670, 119 S.Ct. 2219. Because Congress passed the TCA pursuant to its Article I powers under the Commerce Clause, *see Bell Atlantic–Delaware v. Global Naps South,* 77 F.Supp.2d 492, 498 (D.Del.1999), the parties opposing the motion to dismiss rely on the second and third means of avoiding Eleventh Amendment immunity, arguing that the Commonwealth waived its immunity and that this suit may proceed against the Commissioners under the *Ex parte Young* doctrine.

1. Waiver

■ Although the constructive waiver doctrine has been severely limited by *College Savings Bank,* the court is persuaded by the decisions of the Seventh and Tenth Circuits that a gratuity constructive waiver is still a viable means by which a state can waive its sovereign immunity. *See Illinois Bell,* 222 F.3d at 338–44; *Public Serv. Comm'n,* 216 F.3d at 935–39. In *College Savings Bank,* the Court overruled *Parden v. Terminal Railway of the Alabama State Docks Department,* 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964), declaring that "the constructive-waiver experiment of *Parden* was ill conceived." *College Sav. Bank,* 527 U.S. at 680, 119 S.Ct. 2219. *Parden* involved a provision of the Federal Employer's Liability Act (FELA) that allowed suit in federal court for violations of the Act against every carrier engaged in interstate commerce. The Supreme Court held that this provision permitted a federal suit against Alabama because the state had chosen to operate a railway system in interstate commerce, thus waiving its sovereign immunity. *See* 377 U.S. at 192, 84 S.Ct. 1207. Similarly, *College Savings Bank* involved the Trademark Remedy Clarification Act, which provided that a state could be sued in federal court for false and misleading advertising in interstate commerce. *See* 527 U.S. at 670, 119 S.Ct. 2219. In *College Savings,* however, the Court rejected the argument that Florida had constructively waived its immunity by choosing ·to engage in an otherwise lawful activity that was regulated by federal law: "there is little reason to assume actual consent based upon the State's mere presence in a field subject to congressional regulation." *Id.* at 680, 119 S.Ct. 2219.

Several courts, including the Seventh and Tenth Circuits, when considering the question of waiver post-*College Savings Bank,* have relied on language in that opinion suggesting that gratuity constructive waivers have not been foreclosed. *See, e.g., Illinois Bell,* 222 F.3d at 338–44; *Public Serv. Comm'n,* 216 F.3d at 935–39; *AT&T Communications of Southwest, Inc. v. Southwestern Bell Tel. Co.,* 86 F.Supp.2d 932, 946–47 (W.D.Mo.1999); *Global Naps South,* 77 F.Supp.2d at 498–500. Under this theory, if Congress offers the states a gift or gratuity that is not otherwise available to them, Congress may condition a state's acceptance of that gift upon a waiver of its immunity. *See College Sav. Bank,* 527 U.S. at 686–87, 119 S.Ct. 2219.

Support for gratuity waivers is found in *College Savings Bank's* approving discussions of *Petty v. Tennessee–Missouri Bridge Commission,* 359 U.S. 275, 79 S.Ct. 785, 3 L.Ed.2d 804 (1959), and *South Dakota v. Dole,* 483 U.S. 203, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987). *Petty* held that a bistate commission, created pursuant to an interstate compact, had consented to suit in federal court because Congress' approval of the compact included a provision permitting such a suit. *See* 359 U.S. at 281–82, 79 S.Ct. 785; *see also College Sav. Bank,* 527 U.S. at 686, 119 S.Ct. 2219. Because "[s]tates *cannot* form an interstate compact without first obtaining the

express consent of Congress; the granting of such consent is a gratuity." *College Sav. Bank*, 527 U.S. at 686, 119 S.Ct. 2219. Similarly, *Dole* held that, under its spending powers, Congress could condition its grant of funds upon the states taking certain actions; therefore, acceptance of the funds entailed an agreement to that condition. *See* 483 U.S. at 210–12, 107 S.Ct. 2793; *see also College Sav. Bank*, 527 U.S. at 686, 119 S.Ct. 2219. "Congress has no obligation to use its Spending Clause power to disburse funds to the States; such funds are gifts." *College Sav. Bank*, 527 U.S. at 686–87, 119 S.Ct. 2219; *see also id.* at 686, 119 S.Ct. 2219 (stating that *Petty* and *Dole* are "fundamentally different" from *Parden* ).

In applying a gratuity constructive waiver analysis to the TCA, the first issue to be resolved is "whether Congress, in inviting the states to waive their Eleventh Amendment immunity, has done so with sufficient clarity." *Illinois Bell*, 222 F.3d at 340 (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981)). On this point, the court adopts the Seventh Circuit's comprehensive analysis in *Illinois Bell* concluding that, although the TCA does not contain explicit waiver language, the structure of the statute clearly expresses Congress' intent that "states could participate in the federal regulatory function delegated to them by the federal government on the condition that their participation be reviewable in federal court." *Id.* at *15.

The second issue is whether a state's decision to regulate pursuant to the TCA constitutes an unequivocal gratuity waiver of its sovereign immunity. The court joins the Seventh and Tenth Circuits, as well as other district courts, in holding that, because Congress could have revoked a state's authority to regulate telecommunications entirely, a state commission's participation in the TCA's procedures regulating access agreements constitutes a gratuity constructive waiver. Crucial to the Supreme Court's distinction between a *Parden* constructive waiver and a gratuity constructive waiver is whether the state has received a gift or whether it was effectively coerced into waiving its immunity. The Court emphasized that "the point of coercion is automatically passed—and the voluntariness of the waiver destroyed—when what is attached to the refusal to waive is the exclusion of the State from otherwise lawful activity." *College Sav. Bank*, 527 U.S. at 687, 119 S.Ct. 2219. While, prior to 1996, regulation of intrastate phone services was left to the states, *see, e.g., Iowa Utils. Bd.*, 525 U.S. at 402–05, 119 S.Ct. 721 (Thomas, J., concurring in part, dissenting in part) (detailing history of federal and local telephone regulation prior to the 1996 Act), the TCA "unquestionably" took away certain aspects of the state's control over local telecommunications, *id.* at 378 n. 6, 119 S.Ct. 721, and, "[a]lthough it did not do so, Congress could have preempted all state regulation of local phone service." *Public Serv. Comm'n*, 216 F.3d at 939 (citing *FERC v. Mississippi*, 456 U.S. 742, 764, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982); *Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 290–91, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981)). As the Tenth Circuit explained,

> with the passage of the 1996 Act, Congress essentially transformed the regulation of local phone service from an otherwise permissible state activity into a federal gratuity. As in *Petty* and *Dole*, Congress was under no obligation to allow states to participate in the Act's regulatory scheme. Accordingly, by conditioning a state's ability to regulate local phone service on its consent to suit in federal court, Congress threatened the state with the denial of a gratuity rather than exclusion from an otherwise lawful activity.

*Id.; see also Illinois Bell*, 222 F.3d at 342 ("Here, the gratuity is federal regulatory

power; the condition is waiver of the state's immunity."); *McMahon,* 80 F.Supp.2d at 232–33 (holding that state participation in federal telecommunications regulation is a gratuity upon which Congress may condition a waiver of state sovereign immunity); *Global Naps South,* 77 F.Supp.2d at 499 (holding that the utility commission was acting under a grant of federal power when it presided over an interconnection agreement and, in so doing, was accepting the gift of this power in exchange for its waiver of immunity).

The PUC relies upon two district courts decisions that held that the states were not offered a gratuity, but rather were coerced into participating in the federal scheme by the Hobson's choice of either consenting to federal regulation and giving up sovereign immunity or losing their power to regulate local exchange carriers. *See AT & T Communications of the S. Cent. States, Inc. v. BellSouth Communications, Inc.,* 43 F.Supp.2d 593, 601–02 (M.D.La.1999); *Bell Atlantic–Md., Inc. v. MFS Intelenet of Md., Inc.,* 1999 U.S. Dist. LEXIS 16477, at *9–10 (D.Md.1999).[13] The PUC emphasizes that any condition that requires it to waive its immunity in order to continue exercising its traditional authority to regulate local telephone markets is inherently coercive. However, these cases, and the PUC's position, fail to acknowledge properly that Congress has the power to preempt completely state regulation of telecommunications. "Congress could—and did—take over regulation of a part of the telecommunications industry.... Such regulation is no longer an 'otherwise permissible activity' for states. Congress

may choose to 'give back' to states some of the regulatory power Congress has taken away, and Congress may attach certain conditions to the return of that power." *Illinois Bell,* 222 F.3d at 344; *see also id.,* 222 F.3d at 344 ( "[T]he state commissions have conducted arbitrations for interconnection agreements ... [and] have approved and enforced those agreements ... under a federal grant of power. Their authority to act was derived from provisions of the Act and not from their own sovereign authority."); *McMahon,* 80 F.Supp.2d at 233 n. 12 ("Because Congress has this undisputed power ..., continued state regulation in this area following the enactment of the Telecommunications Act is (in the constitutional sense) a gratuity upon which Congress may condition federal court review of state commission actions."). Finally, the PUC argues that only the Commonwealth may waive its immunity and any action by the Commission does not constitute a valid waiver. On this issue, the court again adopts the reasoning of the Seventh Circuit and finds that the Commonwealth has waived its immunity by failing to prevent the Commission from participating in the federal scheme under the TCA. *See Illinois Bell,* 222 F.3d at 344 n. 10

#### 2. *Ex Parte Young*

In the alternative, the court finds that even if the Commission is immune, this action may proceed against the individual Commissioners under the doctrine of *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).[14] That doctrine

---

**13.** *Illinois Bell,* 222 F.3d 323, reversed a third district court case upon which the PUC relied, *Wisconsin Bell, Inc. v. Public Service Commission of Wisconsin,* 57 F.Supp.2d 710, 715 (W.D.Wis.1999).

The PUC also argues that, in addition to the two district courts, the Sixth Circuit has rejected the notion of a gratuity waiver. However, the Sixth Circuit, in a footnote, simply acknowledged that *College Savings Bank* generally rejected the notion of constructive

waiver, without addressing whether a gratuity constructive waiver survived that decision. *See GTE N., Inc. v. Strand,* 209 F.3d 909, 922 n. 6 (6th Cir.2000). The court does not find *Strand* persuasive on the issue of waiver in light of the considered decisions by the Seventh and Tenth Circuits.

**14.** Worldcom argues that this court is collaterally estopped from deciding the PUC's sovereign immunity claim, since the Middle

operates as an exception to the general rule of state sovereign immunity and allows suits against state officials for prospective injunctive relief to end a continuing violation of federal law. *See id.* at 159–60, 28 S.Ct. 441;[15] *see also Seminole Tribe,* 517 U.S. at 73, 116 S.Ct. 1114. The Sixth, Seventh, and Tenth Circuits have all found that *Ex parte Young* allows actions under section 252 to proceed against individual commissioners. *See Illinois Bell,* 222 F.3d at 344–47; *Public Serv. Comm'n,* 216 F.3d at 939–40; *see also Michigan Bell Tel. Co. v. Climax Tel. Co.,* 202 F.3d 862, 867 (6th Cir.2000) (holding that application of section 252 against the individual commissioners of the Michigan Public Service Commission "is a straightforward *Ex parte Young* case"; noting that most district courts have held the same).

The PUC, however, argues that *Seminole Tribe*'s remedial scheme limitation of *Ex parte Young* applies with equal force to the TCA. In *Seminole Tribe,* the Court cautioned that "where Congress has prescribed a detailed remedial scheme for the enforcement against a State of a statutorily created right, a court should hesitate before casting aside those limitations and permitting an action against a state officer

based on *Ex parte Young*." 517 U.S. at 74, 116 S.Ct. 1114. The statutory scheme at issue in *Seminole Tribe* was the Indian Gaming Regulation Act, that, *inter alia,* set forth a process by which states and tribes were to negotiate a tribal-state compact governing the conduct of gaming activity by the tribe. *See id.* at 48–49, 116 S.Ct. 1114. States were required to negotiate in good faith, and the Act provided that a tribe could bring suit in federal district court if the state failed to do so. *See id.* at 49–50, 116 S.Ct. 1114. If the court found for the plaintiff tribe, the Act's elaborate remedial scheme required the court to order the parties to conclude a compact within sixty days. If the parties failed to do so, the court was to appoint a mediator who would select one of the proposals submitted by the parties. The state was required to accept the compact selected by the mediator within sixty days, and, if it failed to do so, the Secretary of the Interior was to prescribe the procedures under which the tribe could conduct gaming on its reservation. *See id.* at 50, 74, 116 S.Ct. 1114. Thus, in contrast to the "full remedial powers" available under *Ex parte Young,* the Act only provided for a "quite modest set of sanctions" against an uncooperative state. *Id.* at 75, 116 S.Ct.

District rejected that argument. *See MCI Telecomm. Corp. v. Bell,* Report and Recommendation (M.D.Pa. Aug. 10, 1998) (finding no Eleventh Amendment immunity because of the PUC's waiver and, alternatively, under *Ex parte Young* ); *id.* Order (M.D.Pa. Nov. 5, 1998) (adopting Report and Recommendation).

Traditionally, four factors must be present before the application of collateral estoppel is appropriate: (1) the previous determination was necessary to the decision; (2) the identical issue was previously litigated; (3) the issue was actually decided in a decision that was final, valid, and on the merits; and (4) the party being precluded from relitigating the issue was adequately represented in the previous action.
*Hawksbill Sea Turtle v. Federal Emergency Management Agency,* 126 F.3d 461, 474–75 (3d Cir.1997).
The Middle District court ruled on immunity prior to *College Saving Bank,* and did not

reach the issue of a gratuity constructive waiver, nor were the issues of abstention, which are unique to this case, raised. While the court did address *Ex parte Young,* as far as can be discerned from the record before this court, the Middle District court did not address the remedial scheme limitation of *Seminole Tribe,* discussed *infra.*

**15.** While the PUC argues that the doctrine only applies when Constitutional rights are violated, numerous cases have recognized that the doctrine extends to violations of federal law. *See e.g., Green v. Mansour,* 474 U.S. 64, 68, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985) ("Remedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law"); *Allegheny County Sanitary Auth. v. United States EPA,* 732 F.2d 1167, 1174 (3d Cir.1984) ("[W]hen federal statutory law has been violated, federal courts may grant an injunction for prospective relief against state officials[.]").

1114; *see also id.* ("[I]t is difficult to see why an Indian tribe would suffer through the intricate scheme of [the Act] when more complete and more immediate relief is available under *Ex parte Young*."). The Court held that because Congress chose "to impose upon the State a liability that is significantly more limited than would be the liability imposed on the state officer under *Ex parte Young*," the tribe could not proceed against Florida under that doctrine. *Id.* at 75–76, 116 S.Ct. 1114.

Unlike the Indian Gaming Regulation Act, section 252 does not impose an elaborate remedial scheme upon a reviewing court; in fact, the statute fails to specify any particular relief. *See Illinois Bell*, 222 F.3d 345–46 (holding that section 252(e)(6) does not indicate how a court is to enforce its ruling and that, therefore, *Seminole Tribe* does not preclude application of *Ex parte Young* against individual commissioners); *McMahon*, 80 F.Supp.2d at 234 (holding that the TCA "is silent as to how federal district courts should enforce their rulings, thus implying that they enjoy the full panoply of remedies allowable in a *Young* suit"); *Southwestern Bell*, 86 F.Supp.2d at 947–48 (holding that the TCA's provision for federal judicial review is far simpler than the Indian Gaming Regulation Act's detailed remedial scheme). The PUC contends that because section 252 only allows a federal court to determine whether or not an access agreement meets sections 251 and 252 of the TCA, a court's power to prescribe remedies is curtailed. However, section 252 only limits a district court's scope of review, it does not render the TCA vulnerable to *Seminole Tribe*'s remedial scheme limitation.

Thus, the court joins with the Sixth, Seventh, and Tenth Circuits in holding

that this action may proceed against the individual commissioners for prospective injunctive relief.[16]

## C. Abstention

The PUC argues that if this court does not dismiss the action under the Eleventh Amendment, it should nevertheless abstain. In support of its argument, the PUC invokes a plethora of doctrines—namely abstention under *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), *Railroad Commission v. Pullman*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), and *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). The PUC faces a heavy burden of persuasion that abstention is appropriate under any of these doctrines:

> Abstention is a judicially created doctrine under which a federal court will decline to exercise its jurisdiction so that a state court or state agency will have the opportunity to decide the matters at issue. The doctrine, born out of a concern for the maintenance of our federal system, represents an extraordinary and narrow exception to the virtually unflagging obligation of the federal courts to exercise the jurisdiction given them. Abdication of the obligation to decide cases can be justified under this doctrine only in the exceptional circumstances where the order to the parties to repair to State court would clearly serve an important countervailing interest.

*Kentucky W. Va. Gas Co.*, 791 F.2d at 1114 (citations, punctuation omitted).

---

**16.** The court rejects the PUC's remaining arguments. The PUC's contention that the suit cannot proceed against the individual commissioners because the Commission is the real party in interest ignores the fiction of *Ex parte Young*. Its argument that the Commission is an indispensable party is similarly unpersuasive. The PUC's policy argument that application of *Ex parte Young* will turn state administrative appeals into federal cases and flood the federal courts ignores the fact Congress essentially provided for just such a review structure in the TCA.

### 1. The Question of Exclusive Federal Jurisdiction

The United States and AT & T contend that this court has exclusive jurisdiction over the federal challenges to the Global Order, relying on sections 252(e)(4) and 252(e)(6). The question of whether a state court may even hear the federal claims is relevant in determining whether any of the abstention doctrines may be invoked.

As noted previously, section 252(e)(4), entitled "Schedule for decision," provides that "[n]o State court shall have jurisdiction to review the action of a State commission in approving or rejecting an agreement under this section." 47 U.S.C. § 252(e)(4). Section 252(e)(6), entitled "Review of State commission actions," provides that "[i]n any case in which a State commission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of section 251 of this title and this section." 47 U.S.C. § 252(e)(6).

By its terms, section 252(e)(4) appears to vest exclusive federal jurisdiction only over a state commission's approval or rejection of an agreement. Arguably, the Global Order does not fit within this narrow frame since it does not specifically approve or reject an agreement between an incumbent LEC and a potential competitor.[17] However, two considerations counsel against interpreting section 252(e)(4) so narrowly. First, it is undisputed that the Global Order sets rates that will be incorporated into future access agreements. Thus, even if a state court has jurisdiction over the federal claims implicated by the Global Order, once the rates are incorporated into an agreement, only a federal court would have jurisdiction over these claims. Since the TCA allows a state commission to consolidate its proceedings under section 252 in order to reduce administrative burdens, see 47 U.S.C. § 252(g), it appears contrary to the review scheme of section 252(e) to conclude that a state commission's decision in a consolidated proceeding may be reviewed by a state court, but a decision in separate proceedings may not be. Second, reading section 252(e)(4) in conjunction with 252(e)(6) suggests that the grant of federal jurisdiction under 252(e)(6) should be construed to be equivalent to the exclusion of state jurisdiction under section 252(e)(4). See Illinois Bell Tel. Co. v. Worldcom Techs., Inc., 179 F.3d 566, 570–71 (7th Cir.1999); see also id. at 571 (holding that when read in conjunction, sections 252(e)(6) and (e)(4) should be interpreted to mean "that Congress envisioned suits reviewing 'actions' by state commissions and that those suits were to be brought exclusively in the federal courts."); cf. Southwestern Bell Tel. Co. v. Public Util. Comm'n, 208 F.3d 475, 480 (5th Cir.2000) ("We conclude that federal court jurisdiction extends to review of state commission rulings on complaints pertaining to interconnection agreements and that such jurisdiction is not restricted to mere approval or rejection of such agreements.").

The court, however, declines to decide at this time whether its jurisdiction over the federal challenges to the Global Order is exclusive because other factors necessary to the exercise of each abstention doctrine invoked by the PUC are not present. Thus, even without deciding the question of whether there is exclusive federal jurisdiction over the federal aspects of Global Order, the court finds that none of the abstention doctrines applies.

### 2. Abstention Doctrines

#### a. Burford

Burford abstention avoids needless conflict with a state's administration of

---

**17.** The PUC has not argued that this court does not have jurisdiction pursuant to section 252(e)(6).

its own affairs. Under this type of abstention, "[w]here timely and adequate state court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies" when one of two factors is met: there must be " 'difficult questions of state law bearing on policy problems of substantial public import' " or "the 'exercise of federal review . . . would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.' " *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans,* 491 U.S. 350, 361, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989) (quoting *Colorado River Water Conservation Dist. v. U.S.,* 424 U.S. 800, 814, 96 S.Ct. 1236, 47 L.Ed.2d 483) (NOPSI).[18] There are no questions of state law before this court; nor would a decision in this forum disrupt the state's efforts to establish a coherent policy under state law, given the TCA's clear intent to inject certain federal standards and federal oversight into state regulation of local services. *See Zablocki v. Redhail,* 434 U.S. 374, 380 n. 5, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978) ("[T]here is . . . no doctrine requiring abstention merely because resolution of a federal question may result in the overturning of a state policy."). Therefore, *Burford* abstention is not appropriate in this action.

b. *Younger*

■ *Younger* abstention, which is rooted in concerns of comity and federalism, requires that federal courts refrain from hearing constitutional challenges to state action under certain circumstances in which the federal action is regarded as an improper intrusion on the right of a state to enforce its own laws in its own courts. "Three requirements must be met before *Younger* abstention is appropriate: (1) there must be an ongoing state judicial proceeding to which the federal plaintiff is a party and with which the federal proceeding will interfere, (2) the state proceedings must implicate important state interests, and (3) the state proceedings must afford an adequate opportunity to raise the constitutional claims." *FOCUS v. Allegheny County Court of Common Pleas,* 75 F.3d 834, 843 (3d Cir.1996). *Younger* abstention does not extend to a state judicial proceeding reviewing legislative or executive action, as is the case here. *See NOPSI,* 491 U.S. at 368, 109 S.Ct. 2506. In *NOPSI,* the Court contrasted these types of actions with "civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions" in which *Younger* abstention might be appropriate. *Id.* The Court held that a state court action in which a decision of a rate-making body was being challenged was "no more than a state court challenge to completed legislative action" and not a proceeding that would require *Younger* abstention. *Id.* at 373, 109 S.Ct. 2506; *see also id.* ("[T]here is no doctrine that the availability or even the pendency of state judicial proceedings excludes the federal courts."). Here too, a decision in this court will not affect the state court's ability to perform its judicial functions: the action in the Commonwealth court is simply a challenge to a decision of the state's rate-making body. *Younger* abstention does not apply.

c. *Pullman*

■ A federal court should abstain under *Pullman* and avoid deciding a federal constitutional question if the case may be disposed in state court on questions of

---

**18.** The first point of analysis is whether there is timely and adequate review in the state court, for "[o]nly if [the court] determines that such review is available, should it turn to the other issues." *Chiropractic Am. v. Lavecchia,* 180 F.3d 99, 104 (3d Cir.1999) (citation, punctuation omitted); *see also id.* at 108 (holding *Burford* abstention is inappropriate when the federal court has exclusive jurisdiction over at least some of the claims). Because this court declines to decide whether it has exclusive jurisdiction over the parties' challenge to the Global Order under the TCA, it addresses the other issues.

state law. "As a matter of law, *Pullman* abstention requires the following special circumstances: (1) uncertain issues of state law underlying the federal constitutional claim; (2) state law issues subject to state court interpretation that could obviate the need to adjudicate or substantially narrow the scope of the federal constitutional claim; and (3) an erroneous construction of state law by the federal court would disrupt important state policies." *Presbytery of N.J. of the Orthodox Presbyterian Church v. Whitman,* 99 F.3d 101, 106 (3d Cir.1996) (citations omitted); *see also Stretton v. Disciplinary Bd. of Supreme Court,* 944 F.2d 137, 140 (3d Cir. 1991) (same). If all three circumstances are present, the court should make a discretionary decision, based on equitable considerations, whether abstention is appropriate under the circumstances. *See Presbytery of N.J.,* 99 F.3d at 106. These considerations include "the availability of an adequate state remedy, the length of time the litigation has been pending, and the potential impact on the parties caused by delay in obtaining a state ruling." *Stretton,* 944 F.2d at 140.

Here, at least two of the circumstances necessary for an exercise of *Pullman* abstention are not present because there are no state law issues underlying the federal constitutional claims and because this action does not raise any state law claims. Admittedly, the Global Order was decided under both state and federal telecommunications law, and, arguably, the state court's decision of the state law aspects of the Order could affect the rates and determinations at issue here. In fact, as Bell conceded at the hearing, one of the forms of relief it seeks from the state court, invalidation of the entire Global Order, would render this case moot. However, that consideration alone is insufficient to allow *Pullman* abstention and, according-

ly, the court will not abstain under that doctrine.[19]

d. *Colorado River*

▮ While the federal courts have a "virtually unflagging obligation ... to exercise the jurisdiction given them" by Congress, *Colorado River* abstention provides for some extremely limited circumstances where considerations of "[w]ise judicial administration" allow a federal court to defer to pending state proceedings in order to avoid duplicative litigation. 424 U.S. at 817, 96 S.Ct. 1236. As a threshold matter, the two actions must be parallel; cases are generally parallel when they involve the same parties and claims. *See Ryan v. Johnson,* 115 F.3d 193, 196 (3d Cir.1997). Factors that can support *Colorado River* abstention include: "(1) whether the state court assumed *in rem* jurisdiction over property; (2) the inconvenience of the federal forum; (3) the desirability of avoiding piecemeal litigation; and (4) the order in which jurisdiction was obtained by the concurrent forums." *Ryan,* 115 F.3d at 196 (citing *Colorado River,* 424 U.S. at 818–19, 96 S.Ct. 1236). In *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,* 460 U.S. 1, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983), the Supreme Court identified two other factors: whether the state court would adequately protect the rights at issue and whether state or federal law provides the rule of decision. *See id.* at 25–27, 103 S.Ct. 927. With regard to the latter factor, "the presence of federal law issues must always be a major consideration weighing against" abstention. *Id.* at 25–26, 103 S.Ct. 927. However, no one factor is determinative, and "[o]nly the clearest of justifications will warrant dismissal." *Colorado River,* 424 U.S. at 818–19, 96 S.Ct. 1236.

Even assuming that the proceedings before the state court and this court are

19. Furthermore, even if all the *Pullman* factors were present, the court would exercise its discretion and not abstain: it is an open question whether the state court can provide an

adequate remedy regarding the federal claims and any delay in eliminating barriers to competition in local telephone markets is against the public interest.

parallel within the meaning of *Colorado River*, none of the other factors favor abstention. The PUC relies primarily on the need to avoid piecemeal litigation and the presence of state law issues in advocating for *Colorado River* abstention. However, avoidance of piecemeal litigation only counsels in favor of abstention when there is an articulated congressional policy against piecemeal litigation. *See Ryan*, 115 F.3d at 198. In the context of the TCA, there is no such articulated policy. In fact, the statutory scheme, which envisions exclusive federal jurisdiction over some matters, while preserving a state's authority to act, consistent with the TCA, suggests that Congress intended the very opposite result. *Compare* 47 U.S.C. § 252(e)(6) (providing for federal jurisdiction over determinations of a state commission), *with id.* § 253(b) ("Nothing in this section shall affect the ability of a State to impose ... consistent with section 254 of this section, requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers."). Moreover, the *Cone* factors counsel against abstention since this case is to be decided under federal, not state, law and, as noted previously, there is a serious question as to whether the state court can address the federal claims. Application of *Colorado River* abstention is inappropriate.

### D. Dismissal of Claims Pursuant to Rule 12(b)(6)

■ The PUC argues that Worldcom and AT & T's crossclaims must be dismissed as untimely because Rule 1512 of the Pennsylvania Rule of Appellate Procedure applies to any challenges to the Global Order. That rule provides for a thirty-day period in which to file a petition for review, and an additional fourteen-day period in which to file a cross petition. The PUC, however, fails to make any compelling argument why Pennsylvania's rules of appellate procedure should apply to this action, which is brought under federal law.

Because the TCA does not specify any statute of limitations, the federal default statute of limitations of four years is applicable to this cause of action. *See* 28 U.S.C. § 1658. The court is not unsympathetic to the PUC's position that four years is far too long a window to allow challenges to access agreements. However, such an argument should be directed to Congress rather than to this court. The claims made by Worldcom and AT & T are timely.

The PUC also contends that the claims brought by Bell, Worldcom, and AT & T that invoke an arbitrary and capricious standard must be dismissed for failure to state a claim, arguing that this is not the correct standard of review and that Bell, Worldcom, and AT & T have impermissibly imported the arbitrary and capricious standard from the Administrative Procedure Act. This argument is premature. The merits of the telecommunications companies' challenge to the Global Order are not yet before the court, and accordingly, the court will defer a decision on the appropriate standard of review to be employed. This portion of the PUC's motion is denied without prejudice.

Similarly, the court will deny without prejudice the portion of the PUC's motion that seeks to dismiss Bell's claim under 42 U.S.C. § 1983. The PUC has failed to demonstrate that there are no set of facts upon which relief could be granted.

### III. Conclusion

This action is not barred by the Eleventh Amendment because PUC has waived its sovereign immunity. In the alternative, the case may proceed against the individual commissioners under *Ex parte Young*. None of the doctrines invoked by the PUC require the court to abstain. The PUC's motion to dismiss AT & T and Worldcom's crossclaims as untimely is denied. The PUC's motion to dismiss the portions of Bell, AT & T, and Worldcom's claims that invoke an arbitrary and capri-

cious standard, and the PUC's motion to dismiss Bell's 42 U.S.C. § 1983 claim, are denied without prejudice.

An appropriate order follows.

### ORDER

**AND NOW,** this 3rd day of August, 2000, upon consideration of defendants the Pennsylvania Public Utility Commission and the individual Commissioners' Motion to Dismiss (doc. no. 30), and intervening Senators Fumo, Madigan, and White's Motion for Judgment on the Pleadings (doc. no. 46), the responses, and reply thereto, and after a hearing, it is hereby **ORDERED** that the motions are **DENIED.**[1]

1. Those portions of the motions that seek to dismiss counts four and five of the complaint, as well as to dismiss the portions of the cross-claims that invoke an arbitrary and capricious standard of review, are denied without prejudice.