**BELL ATLANTIC—PENNSYLVANIA, INC., Plaintiff,**

v.

**THE PENNSYLVANIA PUBLIC UTILITY COMMISSION, et al., Defendants.**

**MCI Telecommunications Corp., et al., Plaintiffs,**

v.

**Bell–Atlantic–Pennsylvania, et al., Defendants.**

**No. Civ.A. 99–5391, Civ.A. 03–685.**

United States District Court, E.D. Pennsylvania.

Dec. 12, 2003.

---

Geoffrey M. Klineberg, Kellogg Huber Hansen Todd & Evans, Washington, DC, Henry F. Siedzikowski, Elliott, Reihner, Siedzikowsky and Egan, P.C., Blue Bell, PA, John M. Elliott, Elliott Reihner Siedzikowski & Egan, Blue Bell, PA, Julia A.

Conover, Philadelphia, PA, Lydia R. Pulley, Arlington, VA, Mark L. Evans, Kellogg Huber Hansen Todd & Evans, Washington, DC, Michael D. Lowe, Arlington, VA, Samuel L. Feder, Kellogg Huber Hansen Todd & Evans, Washington, DC, Stuart D. Lurie, Pepper Hamilton LLP, Suzan Debusk Paiva, Philadelphia, PA, Thomas B. Schmidt, III, Pepper Hamilton LLP, Harrisburg, PA, for Bell Atlantic–Pennsylvania, Inc.

Bohdan R. Pankiw, Harrisburg, PA, Elisabeth H. Ross, Harvey A. Levin, Birch, Horton, Bittner and Cherot, Washington, DC, Maryanne R. Martin, Pa. Public Utility Commission, Harrisburg, PA, for Pennsylvania Public Utility Com'n.

Elisabeth H. Ross, Harvey A. Levin, Birch, Horton, Bittner and Cherot, Washington, DC, Maryanne R. Martin, Pa. Public Utility Commission, Harrisburg, PA, for John M. Quain, Robert K. Bloom, Nora Mead Brownell, Aaron Wilson, Jr.

Stuart D. Lurie, Pepper Hamilton LLP, Philadelphia, PA, for Verizon Pennsylvania Inc.

Jeffrey A. Rackow, Worldcom, Inc., Matthew B. Pachman, Michael B. Desanctis, Jenner & Block, LLC, Washington, DC, Thomas E. Groshens, Virginia Hinrichs Mc Michael, Dilworth, Paxson, LLP, Virginia I. Miller, Anderson Kill & Olick PC, Philadelphia, PA, for MCI WorldCom Network Services, Inc., MCIMetro Access Transmission Services, LLC.

David L. Lawson, David M. Levy, Sidley Austin Brown & Wood LLP, Washington, DC, John J. Langhauser, AT & T Communications of Pennsylvania, Inc., Oakton, VA, Joseph C. Crawford, Wolf Block Schorr & Solis–Cohen, Philadelphia, PA, Stephen B. Kinnaird, Sidley & Austin, Washington, DC, Michael B. Desanctis, Jenner & Block, LLC, Washington, DC, for AT & T Communications of Pennsylvania, Inc.

Joseph C. Crawford, Wolf Block Schorr & Solis–Cohen, Philadelphia, PA, Stephen B. Kinnaird, Sidley & Austin, Washington, DC, for TCG Pittsburgh, TCG Delaware Valley, Inc.

Zsuzsanna E. Benedek, Sprint Communications Co., LP, Harrisburg, PA, for United Telephone Company of Pennsylvania.

David T. Zaring, U.S. Dept. of Justice, Federal Programs Branch, Rachel J. Hines, Federal Programs Branch, Washington, DC, for United States.

## MEMORANDUM & ORDER

KATZ, Senior District Judge.

These consolidated actions arise from two challenges to decisions of the Pennsylvania Public Utilities Commission ("PUC") evaluating an interconnection agreement reached by Verizon Pennsylvania, Inc. ("Verizon," known then as Bell Atlantic–Pennsylvania) and MCI Worldcom ("Worldcom") for compliance with the Telecommunications Act of 1996, 47 U.S.C. § 251 et seq.[1] Each action was brought pursuant to 47 U.S.C. § 252(e)(6), which

---

1. Congress passed the Telecommunications Act of 1996 in order that "local service, which was previously operated as a monopoly overseen by the several states, be opened to competition according to standards established by federal law." *MCI Telecomm. Corp. v. Bell Atl.-Pa.,* 271 F.3d 491, 497 (3d Cir.2001). In order to accomplish this goal, the Telecommunications Act imposes affirmative duties upon local incumbent carriers, like Verizon, the "foremost" of which is to share its network with competitors. *AT & T Corp. v. Iowa Util. Bd.,* 525 U.S. 366, 371, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999). An incumbent can carry out this duty in one of three ways: "(1) by selling local telephone services to competitors at wholesale rates; (2) by allowing competitors to interconnent to the incumbent's existing network; or (3) by leasing network elements to competitors on an unbundled ba-

grants federal district court jurisdiction over suits filed by parties aggrieved by state commission determinations under the Act.

The first action, filed by Verizon and Worldcom in the Middle District of Pennsylvania, posed challenges to the PUC's 1997 Final Order in its MFS III proceeding ("MFS III" [2]), approving an interconnection agreement between the parties. Worldcom, joined by party plaintiff AT &

T, argued that the rates set by the PUC for Verizon's unbundled network elements ("UNE's"), which were incorporated into the interconnection agreement, violated the Telecommunications Act [3] and the FCC's implementing regulations.[4] The court agreed, holding that the rates Verizon sought to charge for its UNE's were at odds with the FCC's total element long run incremental cost ("TELRIC") methodology [5] for calculating such rates. The

sis." *Id.* The merits of this dispute concern the third way to fulfill this obligation.

2. On April 19, 1997, the PUC issued an Interim Order in MFS III adopting Verizon's cost model for its ratesetting determinations. On August 7 of that same year, the PUC issued its Final Order, which affirmed most aspects of the Interim Order and directed that the rates established during the proceeding be incorporated into the interconnection agreement between Verizon and Worldcom.

3. The Act provides that UNE rates must be set (1) "based on the cost (determined without reference to a rate-of-return or other rate-based proceeding) of providing the ... network elements, which may include a reasonable profit; and (2) nondiscriminatory." 47 U.S.C. § 252(d)(1)(A). *See also* § 251(c)(3) (explaining that prices for UNE's must be just, reasonable, and nondiscriminatory). Congress set forth this novel ratesetting mandate—which stood in stark contrast to the familiar public-utility model of regulating rates—in order "to give aspiring competitors every possible incentive to enter local retail telephone markets, short of confiscating the incumbents' property." *Verizon Comm., Inc. v. FCC*, 535 U.S. 467, 489, 122 S.Ct. 1646, 152 L.Ed.2d 701 (2002).

4. Congress directed the FCC to promulgate regulations implementing its local competition provisions, and the Commission responded by issuing a 700–page decision shortly after the Act's passage. *In re Implementation of the Local Competition Provisions in the Telecomm. Act of 1996*, 11 F.C.C.R. 15499 (1996), 1996 WL 452885. In establishing these rules, the FCC built upon a novel statutory rate-making standard, the goal of which was "to achieve the entirely new objective of uprooting the monopolies that traditional

rate-based methods had perpetuated." *Verizon Comm.*, 535 U.S. at 488, 122 S.Ct. 1646. This new philosophy of rejecting backward looking cost models—and their inherent inefficiencies—is perhaps most apparent in the rules adopted by the Commission to implement Sections 251(c)(3) and 252(d)(1), the central provisions relating to prices for UNE's. *Id.* at 495, 122 S.Ct. 1646 ("Within the discretion left to it after eliminating any dependence on a rate-of-return or other rate-based proceeding, the Commission chose a way of treating cost as forward-looking economic cost, something distinct from the kind of historically based cost ... [previously] relied upon in valuing a rate.") (citations and quotations omitted).

5. The FCC regulations require that UNE prices be set according to TELRIC methodology, which measures the forward-looking, economic costs of providing a network element, such that it "best replicates, to the extent possible, the conditions of a competitive market." *Matter of Implementation of Local Competition Order*, 11 F.C.C.R. 15499, 15846, 1996 WL 452885. *See also* 47 C.F.R. § 51.505 (explaining that the forward looking cost of a network element is a sum of its TELRIC and a reasonable allocation of common costs). As such, rather than looking at an incumbent's actual or historical costs—which reflect past inefficiencies, older technologies, and outdated operating practices—TELRIC-based rates should be calculated based on "the use of the most efficient telecommunications technology currently available and the lowest cost network configuration, given the existing location of the incumbent LEC's wire centers." 47 C.F.R. § 51.505(b)(1). The FCC has explained that adherence to this pricing methodology is

Middle District reached the merits only after first deciding that the PUC, despite its urging, was not entitled to Eleventh Amendment immunity from suit.

On appeal, the Third Circuit upheld the Eleventh Amendment decision but reversed in part on the merits, concluding that the trial court had not sufficiently analyzed the substance of the PUC's cost model in order to properly determine its lawfulness. It then remanded the case to the district court with instructions "to review the substance and merits of the PUC methodology and its pricing decision ... to determine whether the prices for unbundled network elements established in the interconnection agreement comport with the Act." *Bell Atl.-Pa.*, 271 F.3d at 522–23.

The second action, instituted by Verizon in this court, with cross-claims filed by Worldcom and AT & T, challenged the PUC's 1999 decision in its global proceedings ("Global Order"[6]), which, as in 1997, set UNE rates that Verizon's prospective competitors believed were inconsistent with the Act. This court, like the Middle District, found that the PUC was not entitled to Eleventh Amendment immunity but certified that question for appeal. It declined to reach the merits of the parties' claims. *Bell Atl.-Pa. v. Pa. Pub. Util.*

*Comm'n,* 107 F.Supp.2d 653 (E.D.Pa.2000), *aff'd Bell Atl.-Pa., Inc. v. Pa. Pub. Util. Comm'n,* 273 F.3d 337 (3d Cir.2001), *cert. denied,* 537 U.S. 941, 123 S.Ct. 340, 154 L.Ed.2d 247 (2002). On appeal, in a companion opinion released on the same day as the Middle District appeal, the Third Circuit affirmed that the Eleventh Amendment was not a bar to suit. On remand, the first action was consolidated with the second and transferred to this court.

In addition to the parties' challenge of the Global Order in this court, they also sought redress by filing petitions for review in the Pennsylvania Commonwealth Court. *Bell Atl.-Pa., Inc. v. Pa. Pub. Util. Comm'n,* 763 A.2d 440 (Pa.Cmwlth.2000). Unlike this court, the Commonwealth Court reached the merits of the dispute and affirmed all aspects of the Global Order as consistent with both state and federal law. *Id.* at 514. The state court action was still pending when this court handed down its initial decision in 2000.

Approximately three months before the Court of Appeals rendered its companion decisions, the PUC began its third generation UNE rate case. The purpose of this proceeding ("Generic Investigation"), initiated on August 31, 2001, was to determine whether the rates set in the 1997 MFS–III

critical to fostering meaningful competition in the local exchange markets, and that absent such an approach, competitors would incur greater costs than incumbents in using facilities, thereby precluding the former from efficiently entering the market. *Local Competition Order,* 11 FCCR 15499, 15839–58, 1996 WL 452885. The Supreme Court has deferred to the FCC's determination, upholding both the Commission's jurisdiction to impose its pricing rules on the states, and the substance of the provisions mandating application of the TELRIC methodology. *Iowa Util. Bd.,* 525 U.S. at 384–85, 119 S.Ct. 721; *Verizon Comm.,* 535 U.S. at 523, 122 S.Ct. 1646 ("We cannot say whether the passage of time will show competition prompted by TELRIC to be an illusion, but

TELRIC appears to be a reasonable policy for now, and that is all that counts.") (citations and quotations omitted).

**6.** In July 1998, the PUC initiated a global settlement conference, designed such that Verizon and its potential competitors could forge a comprehensive settlement to modify the 1997 rates and settle other issues relating to Verizon's duties under the Telecommunications Act. After eventually terminating this conference and presiding over a contested hearing on the merits, the PUC, on September 30, 1999, issued its Global Order. In so doing, the PUC adopted new UNE rates and ordered that they be incorporated into the interconnection agreement between the parties to replace the rates set in MFS III.

Final Order and the 1999 Global Order were just and reasonable. The PUC issued a Tentative Order in this third proceeding on October 24, 2003, in which it indicated that it might change certain assumptions upon which it relied to arrive at the 1997 and 1999 rates. On November 13, the PUC voted unanimously to issue a Final Order in the Generic Investigation. It has represented that such Order would be issued on or about December 1, 2003.

Now before this court is a Motion for Summary Judgment filed by the PUC, in which it raises three distinct claims. First, it argues that this court lacks jurisdiction over the dispute because it must afford full faith and credit to the decision of the Pennsylvania Commonwealth Court, which upheld all aspects of the Global Order. Second, the PUC maintains that even if this court has jurisdiction under the 1996 Act, it must find that the provision of the Act granting such jurisdiction is unconstitutional because it exceeds Congress' authority under the Commerce Clause. Finally, the PUC asserts that even if this court has jurisdiction under the 1996 Act to enjoin it from continuing to enforce the Global Order rates, that jurisdiction does not include the power to compel the PUC to calculate new rates. This court finds each argument unavailing for the reasons set forth below.

## A. Res Judicata

■ The PUC's primary contention is that, pursuant to the principles of res judicata and full faith and credit, this court lacks subject matter jurisdiction in the instant case because the claims at issue have already been decided by a state court of competent jurisdiction, the Pennsylvania Commonwealth Court. *See Pa. PUC,* 763 A.2d at 513 (affirming all aspects of the PUC Global Order). This argument, however, is fatally flawed because Congress has vested exclusive jurisdiction in the federal district courts to decide appeals from state commission determinations on interconnection agreements under the Telecommunications Act. 47 U.S.C. §§ 252(e)(4), 252(e)(6). As such, because the Commonwealth Court lacked jurisdiction to decide this controversy from the outset, this court is not obligated to lend full faith and credit to its decision.

■ According to the Full Faith and Credit Act, a federal court must give the same preclusive effect to a state court judgment as would be given under the law of that state. 28 U.S.C. § 1738. To determine the contours of the preclusive effect in a given case, a federal court is required to look first to state preclusion law. *Marrese v. Am. Acad. of Orthopaedic Surgeons,* 470 U.S. 373, 381, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985). This requirement even applies when the claim that might be precluded is within exclusive federal jurisdiction. *Nanavati v. Burdette Tomlin Mem'l Hosp.,* 857 F.2d 96, 111 (3d Cir. 1988) (citing *Marrese,* 470 U.S. at 379–86, 105 S.Ct. 1327).

■■ In Pennsylvania, any final judgment on the merits entered by a court of competent jurisdiction operates as a bar to any identical future action between the parties. *Urrutia v. Harrisburg County Police Dep't,* 91 F.3d 451, 461 (3d Cir.1996) (citing *Hopewell Estates, Inc. v. Kent,* 435 Pa.Super. 471, 646 A.2d 1192, 1194 (1994)). It is also true, however, that "under Pennsylvania law, if federal jurisdiction is exclusive, the state decision cannot act as a bar to litigation in the federal court." *McCarter v. Mitcham,* 883 F.2d 196, 197 (3d Cir.1989).

As the Court of Appeals has explained, "Although neither the Superior Court nor the Supreme Court of Pennsylvania have spoken to the issue, Pennsylvania claim preclusion law also appears to require that the original court have subject matter jurisdiction over the cause of action in order

for a claim based on that cause of action to be later barred in a second lawsuit in a court with subject matter jurisdiction over the cause of action." *Id.* at 199. *See also Marrese*, 470 U.S. at 382, 105 S.Ct. 1327 ("If state preclusion law includes this requirement of prior jurisdictional competency, which is generally true, a state judgment will not have claim preclusive effect on a cause of action within the exclusive jurisdiction of the federal courts."); *McNasby v. Crown Cork & Seal Co., Inc.*, 888 F.2d 270, 276 (3d Cir.1989) ("[T]he rule that no preclusion attaches when the first court did not have jurisdiction over the claim brought is nearly universal.") (citations and quotations omitted); *Adelman, D.O. v. Mercy Catholic Med. Ctr.*, 1996 WL 635661, at *6 (E.D.Pa.1996) (holding that state court decisions on claims arising under the Sherman Act have no preclusive effect on federal courts under Pennsylvania law because Congress conferred exclusive federal jurisdiction over such claims). Based upon the foregoing, if this court finds that Congress has vested exclusive jurisdiction in the federal courts over appeals from state commission determinations on interconnection agreements, then the Commonwealth Court's decision has no preclusive effect. As discussed *infra*, such a finding is consistent with Third Circuit precedent.

■ Although state and federal courts are presumed to have concurrent jurisdiction over federal law claims, Congress can affirmatively divest state courts of that presumptively concurrent jurisdiction in three ways. *Yellow Freight Sys., Inc. v. Donnelly*, 494 U.S. 820, 823, 110 S.Ct. 1566, 108 L.Ed.2d 834 (1990). As outlined by the Supreme Court, Congress can rebut the presumption of concurrent jurisdiction: (1) by explicit statutory directive, (2) through an unmistakable implication from the statute's legislative history, or (3) by a clear incompatibility between federal interests and state-court jurisdiction. *Tafflin*

*v. Levitt*, 493 U.S. 455, 459–60, 110 S.Ct. 792, 107 L.Ed.2d 887 (1990) (citing *Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 478, 101 S.Ct. 2870, 69 L.Ed.2d 784 (1981)). In passing the Telecommunications Act of 1996, Congress made an explicit statutory directive divesting state courts of jurisdiction to review state commission determinations on interconnection agreements. Such authority is enjoyed exclusively by the federal courts.

Section 252 of the Telecommunications Act creates a scheme providing for regulatory oversight of interconnection agreements. First, a local exchange carrier wishing to compete in a given region may petition the incumbent carrier for either interconnection, services, or network elements. 47 U.S.C. § 252(a)(1). Upon such request, the incumbent may voluntarily enter into negotiations with its prospective competitor. *Id.* At any point during these negotiations, either party can call upon a state commission to mediate any differences that may arise. *Id.* § 252(a)(2). In addition, the statute provides for arbitration by state commissions to initiate or facilitate negotiation. *Id.* § 252(b)(1).

Once the parties have reached an agreement, whether through negotiation or arbitration, it must be submitted to a state commission for approval or rejection. *Id.* § 252(e)(1). Any such action is subject to judicial review, the contours of which are defined in Sections 252(e)(4) and 252(e)(6). The former provides that, "No state court shall have jurisdiction to review the action of a State commission in approving or rejecting an agreement under this section." *Id.* § 252(e)(4). Furthermore, as set forth by the latter, "In any case in which a State commission makes a determination under this Section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the

agreement or statement meets the requirements of section 251 of this title and this section." *Id.* 252(e)(6).

■■■ The PUC urges this court to read Sections 252(e)(4) and 252(e)(6) separately and, moreover, to adopt a narrow construction of the former. In other words, it argues that Congress only explicitly provided for exclusive federal review of state court decisions *approving* or *rejecting* agreements,[7] and that it intended for state and federal courts to have concurrent jurisdiction over appeals from all other state commission *determinations* regarding whether an agreement or statement complies with Section 251. The alternative approach, advanced by Worldcom, AT & T, the Government, and the FCC,[8] is to read the two sections in conjunction and conclude that Congress explicitly directed that federal courts enjoy exclusive jurisdiction over appeals from all state commission determinations on interconnection agreements. This court adopts the latter approach, as it is consistent with binding Third Circuit authority.

In *Bell Atl.-Pa.*, the Third Circuit read Sections 252(e)(4) and 252(e)(6) together and explained that "federal jurisdiction for the review of commission decisions *on* interconnection agreements is exclusive." 271 F.3d at 512 (emphasis added). Such an approach is consistent with the weight of the authority in the Courts of Appeals. *See, e.g., Verizon N., Inc. v. Strand,* 309 F.3d 935, 941–42 (6th Cir.2002) (characterizing § 252(e)(4) as "emphasizing the importance to Congress" of the federal review provided for in § 252(e)(6)); *MCI Telecomm. Corp. v. Ill. Bell Tel. Co.,* 222 F.3d 323, 337–38 (7th Cir.2000) ("Congress envisioned suits reviewing actions by state commissions, as opposed to suits reviewing

7. In advancing this argument, the PUC next contends that Section 252(e)(4) does not apply in the instant case because its Global Order was neither an explicit approval nor rejection of the interconnection agreement between Verizon and Worldcom. As such, the argument goes, this court does not have exclusive jurisdiction and it must, therefore, apply res judicata and enforce the Commonwealth Court's decision. The PUC maintains that the Global Order merely "established rates outside the interconnection agreement review process." PUC Reply Brief, at 7. In essence, the PUC claims that it set rates in 1999 that simply replaced the existing rates. For its part, AT & T argues that, "Although the Global Order did not constitute the PUC's initial order approving the interconnection agreements then already in effect, the Order's prescription of revised UNE rates effectively 'rejected' existing agreements to the extent that they had established rates for UNE's and 'approved' new agreements with revised rates." AT & T Reply Brief, at 13–14. Such reasoning comports with that adopted by this court in its previous decision in this case. *Bell Atl.-Pa.,* 107 F.Supp.2d at 665 ("It is undisputed that the Global Order sets rates that will be incorporated into future access agreements. Thus, even if a state court has

jurisdiction over the federal claims implicated by the Global Order, once the rates are incorporated into the agreement, only a federal court would have jurisdiction over these claims."). Nevertheless, this court need not determine whether the Global Order was an order approving or rejecting an agreement, because it finds, as set forth *infra,* that Congress made an explicit statutory directive divesting state courts of jurisdiction to review all state commission determinations pertaining to interconnection agreements—and not just those that constitute approval or rejection.

8. As the FCC is the federal agency charged with interpreting and administering the 1996 Act, its position is entitled to considerable deference from this court. *Iowa Util. Bd.,* 525 U.S. at 397, 119 S.Ct. 721 (Souter, J., concurring in part and dissenting in part) ("I agree with the Court's holding that the Federal Communications Commission has authority to implement and interpret the disputed provisions of the Telecommunications Act of 1996, and that deference is due to the Commission's reasonable interpretation under *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)").

only the agreements themselves, and ... intended that such suits be brought exclusively in federal court."); *S.W. Bell Tel. Co. v. Brooks Fiber Communications of Okla., Inc.*, 235 F.3d 493, 497 (10th Cir. 2000) ("A rule that restricted a district court's jurisdiction to review of a state commission's approval or rejection of an interconnection agreement would lead to results that Congress could not have intended."); *S.W. Bell Tel. Co. v. Pub. Util. Comm'n of Tex.*, 208 F.3d 475, 480–81 (5th Cir.2000) ("We conclude that federal court jurisdiction extends to review of state commission rulings on complaints *pertaining to* interconnection agreements and that such jurisdiction is not restricted to mere approval or rejection of such agreements.") (emphasis added); *Iowa Util. Bd. v. FCC*, 120 F.3d 753, 804 (8th Cir.1997) ("[T]he provision of federal district court review contained in subsection 252(e)(6) is the exclusive means of retaining review of state commission determinations under the Act."), *rev'd in part on other grounds, AT & T Corp. v. Iowa Util.Bd.*, 525 U.S. 366, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999); *Bell Atl.-Pa.*, 107 F.Supp.2d at 665 ("Reading section 252(e)(4) in conjunction with 252(e)(6) suggests that the grant of federal jurisdiction under 252(e)(6) should be construed to be equivalent to the exclusion of state jurisdiction under section 252(e)(4)."). *But see Bell Atl.-Md., Inc. v. MCI Worldcom, Inc.*, 240 F.3d 279, 302–03 (4th Cir. 2001) (holding that state commission actions administering and enforcing interconnection agreements are reviewable by state courts).

In light of this precedent, this court finds that, in Sections 252(e)(4) and 252(e)(6), Congress made an explicit statutory directive conferring exclusive federal jurisdiction over appeals from determinations by state commissions pertaining to interconnection agreements under the 1996 Act. As such, the Commonwealth Court lacked jurisdiction to adjudicate this dispute, and its decision is not entitled to full faith and credit.[9]

### B. Constitutionality of Section 252(e)(4)

The PUC next argues that even if Section 252(e)(4) applies in the instant case, its grant of exclusive federal jurisdiction is facially unconstitutional. In particular, the PUC urges that because the Telecommunications Act was enacted pursuant to Congress' commerce power, any of its provisions must be necessary and proper to carry out that power. U.S. Const. art. I, § 8, cl. 18. Because the grant of exclusive jurisdiction was neither necessary in that it was not needed to achieve the Act's goals, nor was it proper in that it violated the principles of state sovereignty embodied in the Tenth Amendment, the argument goes, Section 252(e)(4) must be stricken as unconstitutional. The court, however, finds this argument unavailing because it is grounded upon a faulty interpretation of both the necessary and proper clause and the Tenth Amendment.

As discussed *supra*, it is well established that Congress has the power to divest state courts of their presumptively concurrent jurisdiction. *Yellow Freight Sys.*, 494 U.S. at 823, 110 S.Ct. 1566. That Congress possesses this authority has been repeatedly confirmed by the Supreme Court. *See The Moses Taylor*, 71 U.S. (4 Wall.) 411, 429–30, 18 L.Ed. 397 (1866) ("The Judiciary Act of 1789 ... recognizes and is framed upon the theory that in all cases to which the judicial power of the

---

**9.** Because this court finds that the Commonwealth Court lacked jurisdiction over this controversy from the outset, it need not address the issue of whether, during the course of that state court proceeding, Worldcom and AT & T properly reserved their respective federal claims.

United States extends, Congress may rightfully vest exclusive jurisdiction in the Federal courts ... The constitutionality of these provisions cannot be seriously questioned"); *Tafflin*, 493 U.S. at 459, 110 S.Ct. 792 ("This deeply rooted presumption in favor of concurrent state court jurisdiction is, of course, rebutted if Congress affirmatively ousts the state courts of jurisdiction over a particular federal claim.") (citations omitted).

■■■ Although Congress does possess the power to define jurisdiction for claims arising under its laws, when a particular law is enacted under an enumerated power, any of its provisions—including a jurisdictional mandate—must be necessary and proper with respect to carrying out that power. In order to determine whether Section 252(e)(4) is necessary and proper, therefore, this court must first examine the scope of both the commerce power and its restrictions.

■■■ Since the mid-twentieth century, the Supreme Court has adopted an expansive view of the commerce power. *United States Dep't of Treasury v. Fabe*, 508 U.S. 491, 499, 113 S.Ct. 2202, 124 L.Ed.2d 449 (1993) ("The emergence of an interconnected and interdependent national economy ... prompted a more expansive jurisprudential image of interstate commerce."). Indeed, under the modern commerce clause doctrine, Congress is empowered to regulate in three categories of activity that the Court has described as "broad." *United States v. Lopez*, 514 U.S. 549, 558, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). First, the commerce clause entitles Congress to legislate regarding the use of "channels" of interstate commerce. *See, e.g., Heart of Atlanta Motel v. United States*, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964) (upholding passage of Title II of the Civil Rights Act of 1964 pursuant to the commerce power). Second, Congress may regulate the "instru-

mentalities" of interstate commerce—including persons and things traveling therein—even though a particular threat may only emanate from decidedly local activity. *See, e.g., S. Ry. Co. v. United States*, 222 U.S. 20, 32 S.Ct. 2, 56 L.Ed. 72 (1911) (upholding amendments to the Safety Appliance Act as applied to vehicles utilized in interstate commerce). Finally, Congress' power to regulate extends to activities that "substantially affect" interstate commerce. *See, e.g., Wickard v. Filburn*, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942) (upholding Agricultural Adjustment Act of 1938 amendments as applied to the production and consumption of homegrown wheat because of the aggregate substantial economic effect on interstate commerce).

■■■ Taken together, the expansive power to regulate in these three realms constitutes the power to regulate a substantial portion of the Nation's economic affairs. As such, there can be no dispute that regulating local telephone markets falls squarely within this power. *F.E.R.C. v. Mississippi*, 456 U.S. 742, 764, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982) ("[T]he commerce power permits Congress to preempt the States entirely in the regulation of private utilities."); *Bell Atl.-Pa.*, 271 F.3d at 503 ("The Telecommunications Act of 1996 was clearly a congressional exercise of its Commerce Clause power.").

■■■ In much the same way as the Court has adopted an expansive view of the commerce power, it has construed the necessary and proper clause to encompass much more that one might expect upon an initial reading of its text. With respect to necessity, the Court recently opined, "We long ago rejected the view that the necessary and proper clause demands that an act of Congress be 'absolutely necessary' to the exercise of an enumerated power. Rather it suffices that [a statute] is 'condu-

cive to the due administration of justice' in federal court, and is 'plainly adapted' to that end." *Jinks v. Richland County, S.C.,* 538 U.S. 456, 123 S.Ct. 1667, 1671, 155 L.Ed.2d 631 (2003) (quoting *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 414–15, 417, 421, 4 L.Ed. 579 (1819)). With respect to propriety, it is clear that in order for a law to be proper, it must not violate the principles of state sovereignty embodied in the Tenth Amendment. *Printz v. United States,* 521 U.S. 898, 923–24, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997).

Based on the foregoing, the PUC's argument that Section 252(e)(4)'s grant of exclusive federal jurisdiction is neither necessary nor proper with respect to the commerce power must fail. First, the PUC's contention that exclusive jurisdiction is not necessary to achieve Congress' goals of developing competitive local telephone markets and achieving uniformity in regulation ignores the Court's construction of necessity. While exclusive federal jurisdiction may not be "absolutely necessary" to meet these ends, it is indeed "plainly adapted" to carrying them out.

To be sure, the purpose of the Act was to eliminate exclusive state regulation of local telephone markets—which uniformly had resulted in state-sponsored monopolies—in favor of a new regulatory scheme that would result in robust competition. *Bell Atl.-Pa.,* 271 F.3d at 497. This scheme was to involve both state and federal participants, whose actions were to be governed by uniform standards established by federal law. There can be no doubt that exclusive federal jurisdiction for re-

view of state commission decisions pertaining to interconnection agreements is plainly adapted to carrying out these goals. In fact, this court is hard-pressed to think of a better way of eliminating exclusive state regulation of local telephone markets than by insisting that parties who are aggrieved by state commission determinations file their appeals in federal—as opposed to state—court.

Second, the PUC's argument that Section 252(e)(4) is not proper because it violates the Tenth Amendment is likewise without merit. The PUC maintains that Congress does not have the power to prohibit state court review of state commission actions because that authority was reserved to the states by the Tenth Amendment. The Commission, however, does not cite to any authority in support of that proposition but instead relies on general federalism arguments in an attempt to explain why such power should be reserved to the states. These arguments miss the mark. The issue before this court is not the normative question of whether the states should possess this power, but the practical inquiry of whether such power has actually been conferred on the federal government. This question too has already been answered by the Third Circuit.

The Court of Appeals has found that in passing the 1996 Act, "Congress validly terminated the states' role in regulating local telephone competition." *Bell Atl.-Pa.,* 271 F.3d at 510.[10] Thus, if eradicating the states' role in the regulation of local

---

**10.** The court explained, "The 1996 Act fundamentally restructured local service by requiring competition and establishing the mechanisms by which competing carriers may enter the market. The Act, passed pursuant to Congress's power over interstate commerce, validly preempted state regulation over competition to provide local telecommunications service. *Congress could have made that pre-*

*emption complete. It could have entirely eliminated any state role in regulating local competition and in conducting arbitration, review and approval of interconnection agreements,* and it could have reserved to the FCC all such review and regulation." *Bell Atl.-Pa.,* 271 F.3d at 510 (emphasis added) (citations and quotations omitted).

telephone markets is a valid exercise of Congressional power, it must follow that divesting state courts of their jurisdiction to review state commission decisions under the Act was likewise proper. Such divestiture was merely one vehicle through which Congress sought to achieve its Constitutionally permissible, overarching goal of eliminating exclusive state regulation of local telephone markets.

 Furthermore, the PUC's argument that Section 252(e)(4) is not proper because it violates principles of state sovereignty is grounded upon a misguided construction of the Tenth Amendment. As the Supreme Court has opined, "The Tenth Amendment states but a truism that all is retained which has not been surrendered." *New York v. United States*, 505 U.S. 144, 156, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992) (quoting *United States v. Darby*, 312 U.S. 100, 124, 61 S.Ct. 451, 85 L.Ed. 609 (1941)). In essence, if the Constitution does not confer a given power on the federal government, then it necessarily withholds that power for the states. Here, because Congress clearly acted within the scope of its commerce power in enacting Section 252(e)(4), this provision can violate neither state sovereignty nor the Tenth Amendment. Thus, this court holds that Section 252(e)(4) is both necessary and proper with respect to the commerce power.

## C. Ex Parte Young

 Finally, the PUC contends that, although this court is empowered to enjoin the PUC's enforcement of any rates it deems non-compliant with federal law, it somehow lacks the authority to order the PUC to conduct further proceedings to establish new, lawful rates. This argument too must fail in light of Third Circuit precedent to the contrary.

 The doctrine of *Ex Parte Young* creates an exception to the Eleventh Amendment's grant of sovereign immunity by permitting suits against individual state officers for prospective relief against ongoing violations of federal law. 209 U.S. 123, 159–60, 28 S.Ct. 441, 52 L.Ed. 714 (1908). In *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, the Supreme Court ruled that this doctrine was properly applied to a suit brought against Maryland state commission officials in which the plaintiff, Verizon, sought to enjoin a commission order that violated the 1996 Act. 535 U.S. 635, 645, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002). Furthermore, the Court also held that Verizon could properly request a declaratory judgment that the commission's past conduct was unlawful, because such a remedy was properly prospective in that it did not impose upon the state a "monetary loss resulting from a past breach of a legal duty on the part of the defendant state officials." *Id.* at 646, 122 S.Ct. 1753 (quoting *Edelman v. Jordan*, 415 U.S. 651, 668, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974)). Thus, *Verizon Md.* stands for the proposition that federal courts have the power to award various types of prospective relief in suits alleging violations of the 1996 Act on the part of state commission officials.

Although the PUC does not dispute that *Ex Parte Young* is controlling, it does argue that this court's power to order prospective relief to end an ongoing violation of federal law extends only to enjoining such a violation. In other words, the PUC maintains that any action by this court ordering the PUC to establish new rates— as opposed to merely enjoining the Commission from enforcing the existing ones— would be beyond the scope of its jurisdiction under *Young*. Once again, however, the PUC's position is directly contrary to that adopted by the Court of Appeals for the Third Circuit in this very case:

"If the terms of the approved interconnection agreement do violate the Act, that violation constitutes an ongoing vio-

lation of federal law. The Commissioners individually are parties to the suit. The carriers seek prospective relief in a declaration that certain provisions of the approved interconnection agreement violate the Act and *in an injunction prohibiting enforcement of the agreement and requiring the PUC to establish different, more appropriate rates, terms, and conditions.* This is the paradigmatic *Young* framework ... The [Telecommunications] Act places *no restrictions* on the scope of the court's review *or on the remedies it may impose.* It places *no restrictions on the form and nature of prospective relief that an aggrieved party may obtain.* The relief available in an action under § 252(e)(6) is precisely the relief that would be available through a *Young* action—the *full panoply of declaratory and injunctive remedies.*" *Bell Atl.-Pa.,* 271 F.3d at 514–15 (emphasis added) (citations omitted).

This court therefore holds that, if it finds the rates to be in violation of federal law, it has the authority not only to enjoin the PUC's enforcement of those illegal rates, but also to order the PUC to establish new, legally compliant rates.

An appropriate Order follows.

### ORDER

**AND NOW,** this 12th day of December, 2003, upon consideration of the Pennsylvania Public Utility Commission and Commissioners' Motion for Summary Judgment (Document 174), and the arguments of the Parties, it is hereby **ORDERED** that the said Motion is **DENIED.**[1]

---

1. The Commission has represented that it would issue an Order on or about December 1, 2003, to reflect its decision of November 13, 2003, and the Court has scheduled a hearing for December 19, 2003 to consider all remaining issues.