2006 WY 110

**UNION TELEPHONE COMPANY,**
**a Wyoming Corporation,**
**Appellant (Petitioner),**

v.

**WYOMING PUBLIC SERVICE COM-**
**MISSION; and Qwest Corporation,**
**Appellees (Respondents).**

**Nos. 05–198, 05–199.**

Supreme Court of Wyoming.

Aug. 31, 2006.

Representing Appellee Wyoming Public Service Commission: Patrick J. Crank, Attorney General; Michael L. Hubbard, Deputy Attorney General; Stephanie Anesi, Assistant Attorney General.

Representing Appellee Qwest Corporation: Paul Hickey, Roger Fransen, and Brandi L. Monger, of Hickey and Evans, Cheyenne, Wyoming.

Before VOIGT, C.J., and GOLDEN, HILL *, KITE, and BURKE, JJ.

BURKE, Justice.

[¶ 1]   Union Telephone Company (Union) appeals from an Order Granting Motion to Dismiss in which the district court determined it lacked subject matter jurisdiction to review two decisions of the Public Service Commission (PSC) regarding an interconnection agreement between Union and Qwest Corporation (Qwest). The district court held that the Federal Telecommunications Act of 1996 (the Act)[1] vests exclusive jurisdiction in the federal courts for judicial review of a State commission decision concerning interconnection agreements. We agree with the finding of the district court and dismiss these appeals for lack of subject matter jurisdiction.

### ISSUE

[¶ 2]   Although the parties present several issues for our consideration, one is dispositive:

Does the Federal Telecommunications Act of 1996, 47 U.S.C. § 251 *et seq.*, vest exclusive jurisdiction in the federal courts for judicial review of a state commission decision concerning interconnection agreements?

### FACTS

[¶ 3]   Union is a telecommunications carrier and is both an Incumbent Local Exchange Carrier (ILEC)[2] and a wireless provider.

Representing Appellant: Bruce S. Asay, of Associated Legal Group, LLC, Cheyenne, Wyoming.

* Chief Justice at time of oral argument.

1. Act of Feb. 8, 1996, Pub.L. No. 104–104, 110 Stat. 56 (codified at 47 U.S.C. § 251 *et seq.*).

2. An Incumbent Local Exchange Carrier ("ILEC") is defined by the Federal Telecommuni-

cations Act of 1996 as the company that was providing local exchange service in a particular geographic area on the effective date of the Act. 47 U.S.C. 251(h). Carriers entering a local exchange market after the effective date of the Act

Qwest is a telecommunications carrier and is also an ILEC. Union purchased PYXIS Communications (PYXIS), a provider of wireless serivces to various locations in Wyoming. Prior to Union's purchase, the PYXIS wireless network was interconnected with Qwest's network and was subject to an interconnection agreement between Qwest and PYXIS. When Union purchased PYXIS, Union did not assume the interconnection agreement. Initially, Qwest permitted Union's traffic on its network despite the lack of an interconnection agreement. Numerous billing disputes between Union and Qwest ensued.

[¶ 4] On September 23, 2003, Qwest sent Union a formal request for negotiations to enter into an interconnection agreement addressing the former PYXIS traffic. Union did not respond to this request. Qwest sent a second formal request for interconnection negotiations. Again, Union did not respond.

[¶ 5] On February 4, 2004, Union filed a complaint with the PSC. In its complaint, Union alleged that Qwest failed to properly route the traffic of Union's newly acquired wireless system. Union contended that Qwest was obligated to provide service pursuant to applicable tariffs. Union sought an order from the PSC requiring Qwest to route Union's wireless traffic in accordance with Union's request.

[¶ 6] On February 26, 2004, Qwest responded by filing a motion to dismiss Union's complaint in which it asserted that the proper forum for resolution of Union's complaint was an arbitration proceeding pursuant to 47 U.S.C. § 252 and that approval of an interconnection agreement between Union and Qwest would moot Union's complaint. On the same date, in a separate action, Qwest filed a Petition for Arbitration with the PSC. In its petition, Qwest requested PSC approval of its proposed interconnection agreement.

[¶ 7] Union did not file a response to Qwest's Petition for Arbitration. Union did, however, request a hearing on the complaint which it had filed. On April 23, 2004, Qwest filed a motion seeking PSC approval of the

are referred to as Competitive Local Exchange

interconnection agreement submitted with its Petition for Arbitration.

[¶ 8] On June 22, 2004, at an open meeting, the PSC approved the interconnection agreement proposed by Qwest. On the following day, the PSC issued its Order Approving Interconnection Agreement. In its order, the PSC found *inter alia* that:

6. Qwest stated that it made its first request to Union for interconnection, under § 252 of the [F]ederal Telecommunications Act of 1996, 47 U.S.C. § 151, *et seq.,* by certified letter to Mr. Howard Woody dated September 23, 2003. A copy of that letter was submitted with Qwest's Petition. Qwest further stated that Union subsequently refused to negotiate for the voluntary adoption of an interconnection agreement, and a second letter was sent on November 24, 2003. A copy of the second letter was also submitted with Qwest's Petition.

7. Following Union's repeated refusal to negotiate, Qwest filed its Petition for Arbitration as provided by 47 U.S.C. § 252, initiating this proceeding on February 26, 2004. Pursuant to 47 U.S.C. § 252(b)(3), "A non-petitioning party to a negotiation under this section [Union] may respond to the other party's petition and provide such additional information as it wishes within 25 days after the State commission receives the petition." As noted above, Union did not respond to Qwest's petition and the time within which Union is allowed to respond has passed.

8. Pursuant to 47 U.S.C. § 252(b)(4)(A), "The State commission shall limit its consideration of any petition under paragraph (1) (and any response thereto) to the issues set forth in the petition and in the response, if any, filed under paragraph (3) [47 U.S.C. § 252(b)(3)]." In addition, action taken by the Commission under 47 U.S.C. § 252 is to be based upon information provided by the petitioner (Qwest) and the "responding party." Because Un-

Carriers ("CLECs").

ion has waived its opportunity to respond, the only issues to be decided are those set forth in Qwest's Petition. Since no information was provided by Union, the Commission may enter its decision on Qwest's Petition based upon the information provided by Qwest. 47 U.S.C. § 252(b)(4)(B).

9. The wireless interconnection agreement template submitted by Qwest contains terms, conditions and rates consistent with those previously approved by the Commission for inclusion in Qwest's Wyoming Statement of Generally Available Terms ("SGAT") and in 16 Commission-approved interconnection agreements between Qwest and other wireless carriers in Wyoming. As such, Qwest's Petition and exhibits establish that Commission approval of the form of interconnection agreement submitted as Exhibit C to the Petition will meet the requirements of 47 U.S.C. § 251 and the regulations of the Federal Communications Commission prescribed pursuant to 47 U.S.C. § 251 and that the rates for interconnection, services and network elements contained in Exhibit C are in accordance with 47 U.S.C. § 252(d). Approval of the agreement submitted by Qwest therefore meets the requirements of 47 U.S.C. § 252(c)(1) and (2).

. . .

11. The Commission finds and concludes that Union has failed to negotiate in good faith pursuant to 47 U.S.C. § 252(b)(5). The Commission further finds and concludes that Union has waived its opportunity to respond to Qwest's Petition for Arbitration and bring issues to the Commission for resolution in this proceeding.

The PSC ordered that the interconnection agreement was to become effective July 1, 2004.

[¶ 9] On July 23, 2004, Union filed a Petition for Rehearing. On December 15, 2004, after hearing argument from the parties, the PSC denied Union's request for rehearing. On the same day, the PSC also granted Qwest's motion to dismiss Union's complaint.

In its Order Dismissing Complaint, the PSC found that the issues presented in Union's complaint had been rendered moot by its approval of the interconnection agreement.

[¶ 10] On January 14, 2005, Union filed two petitions for review with the district court. In docket 05–198, Union sought review of the PSC's decision to approve the interconnection agreement. In docket 05–199, Union sought review of the PSC's decision to dismiss Union's complaint. Qwest filed a motion to dismiss both petitions asserting the district court lacked jurisdiction to determine Union's claims because, under the Federal Telecommunications Act of 1996, review of State commission decisions concerning interconnection agreements lies exclusively with the federal courts. The district court granted the motion. Union appealed.

### STANDARD OF REVIEW

[¶ 11] We must determine whether the Federal Telecommunications Act of 1996 provides exclusive jurisdiction to the federal courts to review the challenged decisions of the PSC. Whether a court has subject matter jurisdiction presents a question of law which we review *de novo*. *Pawlowski v. Pawlowski*, 925 P.2d 240, 242 (Wyo.1996).

### DISCUSSION

[¶ 12] Congress enacted the Telecommunications Act of 1996 to create and encourage competitive markets in the telephone and wireless industry. As explained by the Eighth Circuit Court of Appeals:

Congress passed the Telecommunications Act of 1996 (the Act), which was designed, in part, to erode the monopolistic nature of the local telephone service industry by obligating the current providers of local phone service (known as "incumbent local exchange carriers" or "incumbent LECs") to facilitate the entry of competing companies into local telephone service markets across the country. Specifically, the Act forces an incumbent LEC (1) to permit a requesting new entrant in the incumbent LEC's local market to interconnect with the incumbent LEC's existing local net-

work and thereby use the incumbent LEC's network to compete with the incumbent LEC in providing telephone services (interconnection); (2) to provide its competing telecommunications carriers with access to individual elements of the incumbent LEC's own network on an unbundled basis (unbundled access); and (3) to sell to its competing telecommunications carriers, at wholesale rates, any telecommunications service that the incumbent LEC provides to its customers at retail rates, in order to allow the competing carriers to resell the services (resale). 47 U.S.C.A. § 251(c)(2)–(4) (West Supp.1997). A company seeking to enter the local telephone service market may request an incumbent LEC to provide it with any one or any combination of these three services. Through these three duties, and the Act in general, Congress sought "to promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies." Telecommunications Act of 1996, Pub.L. No. 104–104, purpose statement, 110 Stat. 56, 56 (1996).

The Act also establishes a system of negotiations and arbitrations in order to facilitate voluntary agreements between incumbent LECs and competing carriers to implement the Act's substantive requirements. When a competing carrier asks an incumbent LEC to provide interconnection, unbundled access, or resale, both the incumbent LEC and the competing carrier have a duty to negotiate in good faith the terms and conditions of an agreement that accomplishes the Act's goals. 47 U.S.C.A. §§ 251(c)(1), 252(a)(1). If the parties fail to reach an agreement through voluntary negotiation, either party may petition the respective state utility commission to arbitrate and resolve any open issues. *Id.* § 252(b). The final agreement, whether accomplished through negotiation or arbitration, must be approved by the state commission. *Id.* § 252(e)(1).

*Iowa Utils. Bd. v. F.C.C.,* 120 F.3d 753, 791–792 (8th Cir.1997), *rev'd in part on other grounds, AT & T Corp. v. Iowa Utils. Bd.,* 525 U.S. 366, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999) (footnotes omitted).

[¶ 13] The Act sets forth a detailed system under which carriers can negotiate agreements for interconnection. The Act provides that interconnection agreements can be reached through negotiation or compulsory arbitration.[3] The Act also requires that

---

3. The Act provides, in relevant part:

§ 252. Procedures for negotiation, arbitration, and approval of agreements

(a) Agreements arrived at through negotiation

(1) Voluntary negotiations. Upon receiving a request for interconnection, services, or network elements pursuant to section 251 of this title, an incumbent local exchange carrier may negotiate and enter into a binding agreement with the requesting telecommunications carrier or carriers without regard to the standards set forth in subsections (b) and (c) of section 251 of this title. The agreement shall include a detailed schedule of itemized charges for interconnection and each service or network element included in the agreement. The agreement, including any interconnection agreement negotiated before February 8, 1996, shall be submitted to the State commission under subsection (e) of this section.

(2) Mediation. Any party negotiating an agreement under this section may, at any point in the negotiation, ask a State commission to participate in the negotiation and to mediate any differences arising in the course of the negotiation.

(b) Agreements arrived at through compulsory arbitration

(1) Arbitration. During the period from the 135th to the 160th day (inclusive) after the date on which an incumbent local exchange carrier receives a request for negotiation under this section, the carrier or any other party to the negotiation may petition a State commission to arbitrate any open issues.

(2) Duty of petitioner

(A) A party that petitions a State commission under paragraph (1) shall, at the same time as it submits the petition, provide the State commission all relevant documentation concerning—

(i) the unresolved issues;

(ii) the position of each of the parties with respect to those issues; and

(iii) any other issue discussed and resolved by the parties.

(B) A party petitioning a State commission under paragraph (1) shall provide a copy of the petition and any documentation to the other party or parties not later than the day on which the State commission receives the petition.

(3) Opportunity to respond. A non-petitioning party to a negotiation under this section may

all interconnection agreements be approved or rejected by the State commission. Specifically, 47 U.S.C. § 252(e)(1) states:

(e) Approval by State commission

(1) Approval required

Any interconnection agreement adopted by negotiation or arbitration shall be submitted for approval to the State commission. A State commission to which an agreement is submitted shall approve or reject the agreement, with written findings as to any deficiencies.

The Act also provides for judicial review of such decisions:

(4) Schedule for decision

If the State commission does not act to approve or reject the agreement within 90 days after submission by the parties of an agreement adopted by negotiation under subsection (a) of this section, or within 30 days after submission by the parties of an agreement adopted by arbitration under subsection (b) of this section, the agreement shall be deemed approved. **No State court shall have jurisdiction to review the action of a State commission in approving or rejecting an agreement under this section.**

. . .

(6) Review of State commission actions

respond to the other party's petition and provide such additional information as it wishes within 25 days after the State commission receives the petition.
(4) Action by State commission.
(A) The State commission shall limit its consideration of any petition under paragraph (1) (and any response thereto) to the issues set forth in the petition and in the response, if any, filed under paragraph (3).
(B) The State commission may require the petitioning party and the responding party to provide such information as may be necessary for the State commission to reach a decision on the unresolved issues. If any party refuses or fails unreasonably to respond on a timely basis to any reasonable request from the State commission, then the State commission may proceed on the basis of the best information available to it from whatever source derived.
(C) The State commission shall resolve each issue set forth in the petition and the response, if any, by imposing appropriate conditions as required to implement subsection (c) of this section upon the parties to the agreement, and shall conclude the resolution of any unresolved issues not later than 9 months after the date on

In a case in which a State fails to act as described in paragraph (5), the proceeding by the Commission under such paragraph and any judicial review of the Commission's actions shall be the exclusive remedies for a State commission's failure to act. **In any case in which a State commission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of section 251 of this title and this section.**

47 U.S.C. §§ 252(e)(4) and 252(e)(6) (emphasis added).

[¶ 14] The parties dispute the proper interpretation and application of the Act. Union contends the PSC lacked authority to enter its order because Qwest did not have statutory authority to request arbitration or to demand an interconnection agreement. The PSC and Qwest contend that Qwest was authorized to invoke the negotiation and arbitration procedures set forth in the Act. All parties cite to the decision of the Federal Communications Commission (FCC) in *In re T–Mobile*, 20 F.C.C.R. 4855 (2005), in support of their position.

[¶ 15] In *T–Mobile*, the FCC stated:

which the local exchange carrier received the request under this section.
(5) Refusal to negotiate. The refusal of any other party to the negotiation to participate further in the negotiations, to cooperate with the State commission in carrying out its function as an arbitrator, or to continue to negotiate in good faith in the presence, or with the assistance, of the State commission shall be considered a failure to negotiate in good faith.
(c) Standards for arbitration. In resolving by arbitration under subsection (b) of this section any open issues and imposing conditions upon the parties to the agreement, a State commission shall—
(1) ensure that such resolution and conditions meet the requirements of section 251 of this title, including the regulations prescribed by the Commission pursuant to section 251 of this title;
(2) establish any rates for interconnection, services, or network elements according to subsection (d) of this section; and
(3) provide a schedule for implementation of the terms and conditions by the parties to the agreement.
47 U.S.C. § 252.

In light of existing carrier disputes, we find it necessary to clarify the type of arrangements necessary to trigger payment obligations. Because the existing rules do not explicitly preclude tariffed compensation arrangements, we find that incumbent LECs were not prohibited from filing state termination tariffs and CMRS providers were obligated to accept the terms of applicable state tariffs. **Going forward, however, we amend our rules to make clear our preference for contractual arrangements by prohibiting LECs from imposing compensation obligations for non-access CMRS traffic pursuant to tariff. In addition, we amend our rules to clarify that an incumbent LEC may request interconnection from a CMRS provider and invoke the negotiation and arbitration procedures set forth in section 252 of the Act.**

*Id.,* ¶ 9, 20 F.C.C.R. at 4860 (internal footnote omitted) (emphasis added). The FCC went on to explain:

In light of our decision to prohibit the use of tariffs to impose termination charges on non-access traffic, **we find it necessary to ensure that LECs have the ability to compel negotiations and arbitrations, as CMRS providers may do today. Accordingly, we amend section 20.11 of our rules to clarify that an incumbent LEC may request interconnection from a CMRS provider and invoke the negotiation and arbitration procedures set forth in section 252 of the Act. A CMRS provider receiving such a request must negotiate in good faith and must, if requested, submit to arbitration by the state commission.**

*Id.,* ¶ 16, 20 F.C.C.R. at 4864–65 (internal footnote omitted) (emphasis added).

[¶ 16] According to Union, in *T–Mobile* the FCC confirmed that, prior to its decision, an incumbent LEC was not authorized to request an interconnection agreement or demand arbitration. Qwest and the PSC assert that, in *T–Mobile,* the FCC simply clarified section 252 and confirmed that an ILEC had authority to request interconnection and invoke the negotiation and arbitration procedures set forth in section 252.

[¶ 17] More significantly, however, Qwest and the PSC contend that resolution of this issue is unnecessary and improper because we lack subject matter jurisdiction to make such a determination. They contend the language, contained in sections 252(e)(4) and 252(e)(6) of the Act, unambiguously provides that federal courts have exclusive jurisdiction to review State commission decisions approving an interconnection agreement. Because Union characterizes its argument on appeal as a challenge to the PSC's authority to act and not as a request for review of the PSC's decision to approve an interconnection agreement, Union contends the provisions in the Act relating to federal judicial review are not relevant or applicable. We agree with the position espoused by Qwest and the PSC.

[¶ 18] The term "subject matter jurisdiction" refers to "the power to hear and determine cases of the general class to which the proceedings in question belong." *Mutual of Omaha Ins. Co. v. Blury–Losolla,* 952 P.2d 1117, 1119 (Wyo.1998). If a court determines that it does not have the requisite jurisdiction, any action taken by the court, other than dismissing the case is null and void. *EOG Resources, Inc. v. State,* 2003 WY 34, ¶¶ 9–10, 64 P.3d 757, 759 (Wyo.2003) (quoting *Weller v. Weller,* 960 P.2d 493 (Wyo. 1998)). "This court can have no greater jurisdiction of the subject matter than the district court. Where the district court is without jurisdiction in an administrative appeal from an agency, this court must dismiss the appeal." *Wyo. Cmty. College Comm'n v. Casper Cmty. College Dist.,* 2001 WY 86, ¶ 12, 31 P.3d 1242, 1248 (Wyo.2001) (citing *Sheridan Retirement Partners v. City of Sheridan,* 950 P.2d 554, 556 (Wyo.1997); *Scanlon v. Schrinar,* 759 P.2d 1243, 1246 (Wyo.1988)).

[¶ 19] Based upon our review of the statutory language contained in the Act and judicial precedent interpreting the pertinent statutory language, we conclude the district court correctly determined it lacked subject matter jurisdiction. Section ·252(e)(6) states that in "any case in which a State commission makes a determination under this section, any party aggrieved by such determination

may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of section 251 of this title and this section." Section 252(e)(4) provides, "[n]o State court shall have jurisdiction to review the action of a State commission in approving or rejecting an agreement under this section." Reading these provisions together, the only logical conclusion is that Congress intended to confine review of State commission decisions concerning interconnection agreements to the federal courts.

[¶ 20] The clear weight of judicial authority supports this conclusion. *See, e.g., Bell Atl–Pa., Inc. v. The Pennsylvania Pub. Util. Comm'n,* 295 F.Supp.2d 529, 537–38 (E.D.Pa. 2003) (citing *Verizon N., Inc. v. Strand,* 309 F.3d 935, 941–42 (6th Cir.2002) (characterizing § 252(e)(4) as "emphasizing the importance to Congress" of the federal review provided for in § 252(e)(6)); *S.W. Bell Tel. Co. v. Brooks Fiber Communications of Okla., Inc.,* 235 F.3d 493, 497 (10th Cir.2000) ("A rule that restricted a district court's jurisdiction to review of a state commission's approval or rejection of an interconnection agreement would lead to results that Congress could not have intended."); *Iowa Utils. Bd.,* 120 F.3d at 804 ("[T]he provision of federal district court review contained in subsection 252(e)(6) is the exclusive means of retaining review of state commission determinations under the Act."). "Interconnection agreements are tools through which the [Act is] enforced. Thus, it is consistent with the [Act] to have state commissions interpret contracts and subject their interpretations to federal review in the district courts." *BellSouth Telecommunications, Inc. v. MCImetro Access Transmission Services, Inc.,* 317 F.3d 1270, 1278 (11th Cir.2003).

[¶ 21] The Pennsylvania Supreme Court explained its recognition of the exclusive nature of federal review:

Adoption of the PUC's concurrent jurisdiction argument would place this Court squarely at odds with the prevailing weight of federal authority. In *MCI Telecomm. Corp. v. Bell Atl.-Pa.,* 271 F.3d 491 (3rd Cir.2001), the Third Circuit found that Sections 252(e)(4) and 252(e)(6) should be read

together and that, when so read, it is clear that "federal jurisdiction for the review of commission decisions on interconnection agreements is **exclusive**." *Id.* at 512 (emphasis added). This conclusion has been reached by other federal courts as well. *See, e.g., MCI Telecomm. Corp. v. Illinois Bell Tel. Co.,* 222 F.3d at 337–38 (reading Section 252(e)(4) in conjunction with Section 252(e)(6) and finding that "Congress envisioned suits reviewing 'actions' by state commissions, as opposed to suits reviewing only the agreements themselves, and that Congress intended that such suits be brought exclusively in federal court."); *Southwestern Bell Tel. Co. v. Public Util. Comm'n of Tex.,* 208 F.3d at 481 ("federal court jurisdiction extends to review of state commission rulings on complaints pertaining to interconnection agreements and such jurisdiction is not restricted to mere approval or rejection of such agreements"); *Illinois Bell Tel. Co. v. Worldcom Techs., Inc.,* 179 F.3d 566, 570–71 (7th Cir.1999) ("subsection 252(e)(4), when read in conjunction with subsection 252(e)(6), shows that Congress contemplated suits against state defendants in federal court"); *see also, e.g., Bell Atl.-Pa., Inc. v. The Pennsylvania Pub. Util. Comm'n.,* 295 F.Supp.2d at 537–38 (collecting cases).

*MCI Worldcom, Inc. v. Pennsylvania Public Utility Commission,* 577 Pa. 294, 844 A.2d 1239, 1248 (Pa.2004).

[¶ 22] Both decisions of the PSC challenged by Union involve approval of an interconnection agreement. The PSC approved an interconnection agreement between Union and Qwest and determined the agreement complied with sections 251 and 252 of the Act. The PSC dismissed Union's complaint because it had been rendered moot when the PSC approved the interconnection agreement. Despite Union's attempt to characterize its appeal as a challenge to the PSC's authority, fundamentally, Union is seeking review of PSC decisions approving an interconnection agreement. Pursuant to 47 U.S.C. § 252, Union's challenge must be brought in federal court.

*CONCLUSION*

[¶ 23]   The District Court correctly determined it lacked subject matter jurisdiction. We also lack subject matter jurisdiction. Accordingly, Union's appeals are dismissed.